In re ENRON CORP., et al., Debtors.

Bayerische Hypo–Und Vereinsbank AG, Plaintiff,

v.

Banca Nazionale Del Lavoro, S.p.A., Defendant.

Banca Nazionale Del Lavoro, S.p.A., Third–Party Plaintiff,

v.

Bank of America, N.A., Cogentrix Energy, Inc., Green Country Energy, LLC, Nepco Procurement Company, and National Energy Production Corporation, Third–Party Defendants.

Bankruptcy No. 01–16034 (AJG). Adversary No. 02–02614.

United States Bankruptcy Court, S.D. New York.

May 16, 2003.

Stroock & Stroock & Lavan, LLP, Brian M. Cogan, Heidi Balk, of counsel, New York City, for Bayerische Hypo–Und Vereinsbank AG.

Gilmartin, Poster & Shafto, LLP, Michael C. Lambert, of counsel, New York City, for Banca Nazionale Del Lavoro, S.p.A.

Scarcella, Rosen & Slome, LLP, Adam L. Rosen, of counsel, Uniondale, NY, for Banca Nazionale Del Lavoro, S.p.A.

Weil, Gotshal & Manges, LLP, Brian S. Rosen, Martin Sosland, James Muenker, of counsel, New York City, for Enron Corp., National Energy Production Corporation, and NEPCO Power Procurement Company.

Dewey, Pegano & Kramarsky, LLP, Keara A. Bergin, and David S. Pegano, of counsel, New York City, for Green Country Energy LLC and Cogentrix Energy, Inc.

Zeichner, Ellman & Krause, LLP, David B. Chenkin, Ronald M. Neumann, Mark Hanchet, of counsel, New York City, for Bank of America.

*MEMORANDUM DECISION GRANTING SUMMARY JUDGMENT IN FAVOR OF BAYERISCHE HYPO–UND VEREINSBANK AG AGAINST BANCA NAZIONALE DEL LAVORO, S.p.A.*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Plaintiff, Bayerische Hypo–Und Vereinsbank AG ("HVB"), brings a Motion for an Order Granting Summary Judgment, or, in the Alternative, Granting Leave to Amend its Complaint. HVB moves for summary judgment ("Motion" or "Summary Judgment Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, on its sole cause of action for breach of a participation agreement by defendant, Banca Nazionale Del Lavoro, S.p.A. ("BNL").

The issue in this adversary proceeding is whether BNL is obligated to reimburse HVB under a participation agreement for funds drawn on an HVB letter of credit. BNL bought a 100% participation interest in a letter of credit that Enron had obtained from HVB. Shortly after Enron's

bankruptcy filing (which constituted a default under the master letter of credit agreement between Enron and HVB), the beneficiary on the letter of credit presented documentation to HVB causing HVB to drawdown on the letter of credit against Enron's account. HVB paid the beneficiary and then sought reimbursement from BNL pursuant to the terms of the participation agreement. BNL declined HVB's request for reimbursement citing violations by HVB of the participation agreement. HVB brings the instant Motion arguing that BNL is obligated to indemnify HVB for the payment of the letter of credit and that BNL's defenses to payment fail as a matter of law. For the reasons discussed below, HVB's motion for summary judgment is granted.

## I. PROCEDURAL HISTORY

On December 2, 2001, Enron Corp. and certain of its affiliated entities ("Enron Corp. Debtors" or "Enron") commenced cases under Chapter 11 of Title 11 of the United States Code. On May 20, 2002, National Energy Production Corporation ("NEPCO") (02–12398), and NEPCO Power Procurement Company ("NEPCO Power") (02–12402), affiliated Enron Corp. entities, commenced cases under Chapter 11 of the Code (the Enron Corp. Debtors, NEPCO and NEPCO Power, collectively "Debtors").[1]

The draw on the Enron letter of credit occurred on December 4, 2001 and BNL rejected HVB's demand for reimbursement on December 5, 2001. On December 10, 2001, HVB commenced a civil action by summons and complaint in the Supreme Court of the State of New York, County of New York against BNL ("State Court Action"). The State Court Action alleged that a participation agreement entered into between HVB and BNL on February 16, 2001 ("Participation Agreement") had been breached by BNL. On December 21, 2001, BNL answered the state court complaint. BNL commenced a third-party action as captioned above, naming, *inter alia,* NEPCO and NEPCO Procurement Company ("NEPCO Procurement") on February 22, 2002.[2] HVB made a motion for summary judgment in the State Court Action seeking judgment against BNL based upon the parties' obligations under the Participation Agreement. The summary judgment motion was argued in state court on March 20, 2002.

On July 12, 2002, with the summary judgment motion still undecided in state court, HVB filed a Notice of Removal causing the State Court Action to be removed to this Court pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027.[3] Upon removal, HVB filed with this Court a Motion for Summary Judgment or in the Al-

---

**1.** NEPCO and NEPCO Power filed for Chapter 11 approximately six months after the events that are the subject of this adversary proceeding.

**2.** As indicated previously National Energy Production Corporation, and NEPCO Power Procurement Company are debtors. The third-party complaint names National Energy Production Corporation and NEPCO Procurement Company as defendants.

BNL's Motion to Remand and For Relief From the Automatic Stay, dated August 19, 2002, sought to add Enron Corp. and NEPCO

Power Procurement Company as third-party defendants.

Presently, the Enron-related entities that are parties to this adversary proceeding are National Energy Production Corporation and NEPCO Procurement Company. Although the pleadings, motions and responsive papers name NEPCO Power Procurement Company (chapter 11 debtor) and NEPCO Procurement Company (third-party defendant), these two entities may in fact be one and the same entity.

**3.** Venue of Debtors' cases is proper pursuant to 28 U.S.C. § 1408.

ternative Granting Plaintiff Leave to Amend.

On August 29, 2002, seeking to remand the adversary proceeding from this Court back to state court, BNL brought a Motion for Remand Pursuant to 28 U.S.C. § 1452(b) and For Relief From the Automatic Stay Under § 362(a). That motion was denied by this Court on October 11, 2002.

On October 24, 2002, this Court heard oral arguments concerning the Motion. Subsequent to oral argument, on October 29, 2002, BNL filed papers under seal alleging several grounds to deny the Motion including Rule 56(f) of the Federal Rules of Civil Procedure. On December 12, 2002, this Court held a conference pursuant to which the Motion was continued in order permit BNL to conduct additional discovery.

The parties reconvened on February 6, 2003 and presented oral argument related to the additional discovery. HVB's Summary Judgment Motion was taken under advisement at the conclusion of the February 6, 2003 hearing.

## II. FACTS

HVB and BNL are the only parties to the Participation Agreement. BNL's defenses to payment under the Participation Agreement implicate several underlying transactions involving a power plant construction project as well as circumstances related to HVB's decision to honor the letter of credit.

### A. Construction Agreement Between Green Country and Enron Subsidiaries

On November 1, 1999, Green Country Energy, LLC ("Green Country"), an indirect wholly-owned subsidiary of Cogentrix Energy Inc. ("Cogentrix"), entered into a fixed-price "turnkey" contract with NEP-CO, a subsidiary of Enron. (Supplemental Affidavit of Michael C. Lambert in Opposition to Plaintiff's Summary Judgment (hereinafter "Supplemental Lambert Aff.") Exhs. C, F). NEPCO agreed to construct and engineer a 795 MW dispatchable gas-fired combined cycle power generation facility in Jenks, Oklahoma ("Jenks Plant") for Green Country ("E & C Agreement"). (Supplemental Lambert Aff. Exhs. F, G). Green Country also entered into a separate equipment procurement contract with NEPCO Procurement, a division of Enron Equipment Procurement Company, for the procurement of certain equipment for the Jenks Plant ("EP Agreement"). (Supplemental Lambert Aff. Exhs. F, H).

The E & C Agreement and EP Agreement at paragraphs 6.2, 6.3 & 6.4 required that NEPCO and NEPCO Procurement provide Green Country with letters of credit in order to provide "security" for the performance of their contractual obligations as contractors. (Supplemental Lambert Aff. Exhs. G, H).

### B. Letter of Credit Issued by HVB on Enron's Account for the Benefit of Green Country

Pursuant to a Master Letter of Credit and Reimbursement Agreement between Enron and HVB dated February 6, 1996 ("Master Letter of Credit"), on December 20, 2000, Enron ("Applicant") requested, on behalf of NEPCO and NEPCO Procurement, and HVB ("Issuing Bank" or "Issuer") agreed to issue an irrevocable standby letter of credit in favor of Green Country ("Beneficiary"). (Plaintiff's 7056-1 Statement ¶ 1; Affidavit of Salvatore Esposito (hereinafter "Esposito Aff.") ¶ 3; Declaration of Brian M. Cogan in Support of Motion for Summary Judgment or Alternatively to Amend (hereinafter "Cogan Decl.") Exhs. 2C, 2E).

On December 21, 2000, HVB issued the requested letter of credit, designated

SB103855, in the amount of $39,000,000 naming Green Country as Beneficiary for Applicant Enron (on behalf of its subsidiaries NEPCO and NEPCO Procurement) ("Letter of Credit"). (Plaintiff's 7056–1 Statement ¶ 2; Esposito Aff. ¶ 4; Cogan Decl. Exh. 2D).

The Letter of Credit contained an expiration date of December 31, 2001. The Letter of Credit also contained instructions and other information for the Beneficiary to observe in the event that it sought to draw against the Letter of Credit, namely: (i) specific language to be contained in the draw certificate and the sight draft;[4] (ii) the time and place for the presentation of draw documents; (ii) details concerning partial draws under the Letter of Credit; (iii) language explaining that the Letter of Credit is unqualified; (iv) language explaining that Applicant bears all fees and costs related to the Letter of Credit; and (v) a choice of law provision.

Under the Master Letter of Credit, Enron had the right to submit applications to HVB for letters of credit that would support the performance of its or its affiliates' obligations to various beneficiaries. (Esposito Aff. ¶ 3). The Master Letter of Credit was entered into based on Enron's credit standing when it was issued in 1996.

(Reply Affidavit of Salvatore Esposito (hereinafter "Esposito Reply Aff.") ¶ 3). The Letter of Credit was irrevocable. (Esposito Reply Aff. ¶ 3). Under the Master Letter of Credit, HVB had no right to demand cash or any other collateral unless Enron defaulted. (Esposito Reply Aff. ¶ 3).

HVB issued multiple letters of credit at Enron's request pursuant to the Master Letter of Credit, the total amount of which exceeded $100,000,000, including the $39,000,000 Letter of Credit. (Plaintiff's 7056–1 Statement ¶ 3; Esposito Aff. ¶ 5).

### C. Participation Agreement Between HVB and BNL Concerning the Letter of Credit

At the request of Enron and BNL, on February 16, 2001, HVB and BNL entered into a Participation Agreement. (Plaintiff's 7056–1 Statement ¶ 4; Esposito Aff. ¶ 5). The Participation Agreement applied to the Letter of Credit issued on December 21, 2000 and provided that BNL accept 100% of the risk on the Letter of Credit. (Plaintiff's 7056–1 Statement ¶ 5; Esposito Aff. ¶ 5).

The Participation Agreement specifically provided that HVB agree to "sell and transfer to [BNL] without recourse, and

---

**4.** Pursuant to the Letter of Credit, in order to draw against the Letter of Credit, Green Country was required to submit two key documents, a sight draft and a draw certificate. The Letter of Credit specifically states the following:

 1) [Green Country's] sight draft drawn on [HVB]
 2) A certificate purportedly signed by a corporate officer of Green Country Energy, LLC stating that, "The Contractor has failed to perform in accordance with [insert relevant sections of the EPC Contract] dated , 1999, between Green Country Energy, LLC and National Energy Production Corporation and NEPCO Procurement Company and we hereby demand payment

in the amount of [Written Amount and Figure] (USD ) under your Standby Letter of Credit Number SB 103855".
Drafts must be drawn and presented at [HVB's] office at 150 East 42nd Street, 28th Floor, New York, N.Y. 10017 not later than the expiration date, 31 December 2001, or any extended date.
The amount of any draft drawn hereunder must be endorsed on this Standby Letter of Credit and marked: "Drawn under Bayerische Hypo-und Vereinsbank AG, 150 East 42nd Street, 28th Floor, New York, N.Y. 10017, standby letter of credit number SB103855" and indicate the date drawn.
*See* Cogan Decl. Exh. 2D.

[BNL agreed to] buy, assume and receive for its own risk, an undivided 100 percent interest . . . in the [Letter of Credit issued by HVB for Enron], and any draw thereunder." (Cogan Decl. Exh. 2F at ¶ 2). As stated above, the rights and obligations of HVB and BNL under the Participation Agreement are the subjects of this motion.

### D. HVB's Other Transactions With Green Country and Cogentrix

As explained above, HVB issued a Letter of Credit for the Enron subsidiaries that were contractors building the Jenks Plant for Green Country. BNL explains that HVB provided capital to Cogentrix for other projects resulting in a total loan exposure of approximately $103,400,000 on Cogentrix projects. (Answer ¶¶ 29–30; Supplemental Lambert Aff. ¶ 10, Exh. C).

Cogentrix had five loans/projects on which HVB was a lender: (i) Cogentrix Eastern America Inc. $20,000,000; (ii) Cogentrix Energy Inc. (corporate exposure) $18,000,000; (iii) Cogentrix of Richmond Inc. $19,400,000; (iv) Green Country Energy LLC $20,500,000; and (v) Ouachita Power LLC $25,500,000. (Supplemental Lambert Aff. Exh. C).

HVB, Cogentrix and Enron were involved in the financing and construction power plants named Cogentrix Southaven; Green Country; and Ouachita. (Supplemental Lambert Aff. Exh. N). On or about December 11, 2001, HVB calculated that it held Enron loan exposures totaling approximately $258,320,000. (Supplemental Lambert Aff. Exh. N).

### E. HVB Moved Enron–Related Credits to the Special Accounts Department

Salvatore Esposito ("Esposito"), Director of the Special Accounts Department of HVB became involved with the Letter of Credit because as of November 28, 2001 all Enron credits with HVB were moved to the Special Accounts Department pursuant to the authorization of C. Theodore Wolfe, head of HVB's Credit Department. (Esposito Aff. ¶ 1; Supplemental Affirmation of Salvatore Esposito (hereinafter "Esposito Supp. Aff.") ¶ 3). According to Esposito, only Enron credits were transferred to his department for administration and the Green Country loan exposure was never transferred to his department for administration but remained in Project Finance at all times. (Esposito Supp. Aff. ¶ 3).

### F. Draw Against the Letter of Credit

Enron Corp. filed for bankruptcy on December 2, 2001. The next day Green Country presented documentation to HVB in order to drawdown [5] the Letter of Credit. (Plaintiff's 7056–1 Statement ¶ 6; Esposito Aff. ¶ 8). At about the same time, two other letter of credit beneficiaries Pacific Gas & Electric Company ("PG & E") and Williams Energy Marketing Trading Co. ("Williams") presented draw documents to HVB in order to drawdown on Enron letters of credit issued by HVB. (Plaintiff's 7056–1 Statement ¶¶ 6–7; Esposito Aff. ¶ 8).

Green Country's draw on the Letter of Credit was processed by Antoinette Wynn ("Wynn"), Director of the Letter of Credit Department of HVB. (Affidavit of Antoinette Wynn (hereinafter "Wynn Aff.") ¶ 1).

**5.** NEPCO, NEPCO Procurement, and Green Country amended paragraph 6.3, effective December 1, 2001, of the construction engineering contract and the equipment procurement contract to state that as "additional security" Green Country drew against several of the contractor's letters of credit in an aggregate amount of $53,020,000. (Supplemental Lambert Aff. Exhs. I, J). The total draw against the letters of credit was the result of the draws against the HVB Letter of Credit of $39,000,000 and a J.P. Morgan Chase letter of credit in the amount of $14,020,000. (Transcript of October 24, 2002 Hearing at 35).

On December 3, 2001, Green Country, as Beneficiary of the Letter of Credit, tendered a draw certificate and sight draft to HVB. (Cogan Decl. Exh. 2G). Wynn determined that Green Country tendered non-conforming draw documents. (Wynn Aff. ¶ 3). Accordingly, HVB rejected the draw documents and informed Green Country of the grounds for rejection. (Plaintiff's 7056–1 Statement ¶ 8; Esposito Aff. ¶ 10).

On December 4, 2001, Green Country re-submitted the draw documentation.[6] (Plaintiff's 7056–1 Statement ¶ 9; Esposito Aff. ¶ 11; Cogan Decl. Exh. 2H). According to HVB, the deficiencies cited by HVB in the draw documents submitted the previous day were cured by Green Country in the re-submitted documents. (Esposito Aff. ¶ 11; Wynn Aff. ¶ 3). The re-submitted draw certificate and sight draft contained the language required by the Letter of Credit.

Wynn determined that there were no grounds for declining payment, and accordingly, authorized that HVB pay Green Country $39,000,000 as requested by the sight draft. (Plaintiff's 7056–1 Statement ¶ 10; Esposito Aff. ¶ 11; Wynn Aff. ¶¶ 3–4). Pursuant to her usual course of conduct, Wynn did not contact legal counsel during her review of Green Country's presentation documents. (Supplemental Reply Declaration of Antoinette Wynn) (hereinafter "Wynn Supp. Reply Decl." ¶ 3). The Letter of Credit was paid at 4:43 p.m. on December 4, 2001 through HVB's Funds Transfer Department. (Wynn Supp. Reply Decl. ¶ 2).

Neither Wynn nor Esposito was aware that Cogentrix was the parent corporation of Green Country, or that HVB's Project Finance Division had any credits outstanding with Cogentrix. (Wynn Aff. ¶¶ 2, 4; Esposito Aff. ¶¶ 17, 19–21; Esposito Supp. Aff. ¶ 2; Second Supplemental Affirmation of Salvatore Esposito ¶ 2). Wynn was aware of the existence of the Participation Agreement. (Wynn Dep. Tr. 63).

Moreover, the Letter of Credit was one of three Enron letters of credit. The two other beneficiaries of Enron letters of credit were PG & E and Williams.[7] (Third Supplemental Reply Declaration of Salvatore Esposito (hereinafter "Esposito Third Supp. Reply Decl.") ¶ 2). Because PG & E and Williams each presented conforming documentation, HVB paid them at or about the same time that the Letter of Credit was paid. (Plaintiff's 7056–1 Statement ¶¶ 6–7; Esposito Aff. ¶¶ 8–10; Esposito Supp. Aff. ¶ 2).

### G. BNL Denies HVB's Request for Reimbursement Under the Participation Agreement

After HVB honored Green Country's draw against the Letter of Credit, HVB

---

6. Wynn's deposition testimony suggests that the draw documents may have been presented on three occasions.

7. At footnote 1 of BNL's 7056–1 Statement, BNL argues that it "does, however, challenge the relevancy and materiality of the alleged facts concerning plaintiff's payment of other Enron-related letters of credit (Plaintiff's Rule 7056–1 Statement ¶¶ 6–7), especially in the absence of any information relating to such letters of credit and the underlying documentation with respect thereto." However, at oral argument BNL argued that "HVB did not treat [the Letter of Credit] the same as the other Enron letters of credit of which it was the sole owner, and that was a violation of its duties to BNL under the participation agreement." (Transcript of February 6, 2003 Hearing at 17). Therefore, BNL's challenge on the basis of relevancy and materiality lacks merit in light of its reliance upon the same transactions for a contrary position at oral argument and in a memorandum that pre-dates its 7056–1 Statement. (See Defendant's Memorandum of Law in Opposition to Plaintiff's Motion (hereinafter "Def.'s Mem.") at 20).

sought reimbursement from BNL. (Esposito Aff. ¶ 12). On December 4, 2001, Wynn sent BNL notification that HVB had paid earlier that same day on a draw submitted by Green Country against the Letter of Credit. (Plaintiff's 7056–1 Statement ¶ 11; Esposito Aff. ¶ 12). Wynn found the documentation presented by BNL to be in order and therefore sought reimbursement from BNL as required by the Participation Agreement. (Esposito Aff. ¶ 12; Cogan Decl. Exh. 2I). BNL did not respond with a payment. (Esposito Aff. ¶ 12).

The next day, December 5, 2001, Wynn submitted a second request to BNL seeking reimbursement. (Plaintiff's 7056–1 Statement ¶ 12; Esposito Aff. ¶ 12; Cogan Decl. Exh. 2J). On December 5, 2001, BNL sent Wynn notification that it was rejecting HVB's demand for reimbursement under the Participation Agreement. (Plaintiff's 7056–1 Statement ¶ 12; Esposito Aff. ¶¶ 12–13; Cogan Decl. Exh. 2K). BNL's response essentially stated that it would not reimburse HVB because the documents submitted by Green Country did not meet the requirements of the Letter of Credit, and thus HVB should not have permitted Green Country to draw. (Cogan Decl. Exh. 2K; Esposito Aff. ¶ 13).

### H. Jenks Plant Completion

A few days prior to the draw on the Letter of Credit, the Green Country Energy Project Monthly Summary Memo dated on or about November 30, 2001, stated that the Jenks Plant was 98% complete. (Supplemental Affirmation of Carmen DePaula (hereinafter "DePaula Supp. Aff.") ¶ 4; Supplemental Lambert Aff. Exh. E). Although the memo was dated November 30, 2001, it was not posted for the project finance syndicate to review until February 2002, approximately two months after the Letter of Credit had been drawn. (DePaula Supp. Aff. ¶ 4).

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, governs summary judgment motions. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995). If the movant carries this initial burden, the non-moving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding whether material factual issues exist, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. 1348. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997).

Materiality is determined by the governing substantive law. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). An issue of fact is "material" if it might "affect the outcome of the suit under the governing law [while] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Housing Auth. of New Haven*, 251 F.3d 307, 314 (2d Cir.2001).

In determining whether the movant has met this burden, a court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001). If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *accord Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir.2000). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).

Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). "The mere existence of a scintilla of evidence in support of the (non-movant's) position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a

verdict in his favor." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

When the construction of a contract is at issue, summary judgment is appropriate when the contract is wholly unambiguous. *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir.1992). Legal memoranda and oral argument are not evidence and do not themselves satisfy respondent's Fed. R.Civ.P. 56(e) burden to submit specific facts showing entitlement to trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (allegations are not specific facts required by Fed.R.Civ.P. 56(e) and will not defeat properly made summary judgment motion).

In New York, when a court adjudicates the rights of parties to a contract it is required to discern the intent of the parties, to the extent that the parties memorialized what they intended, by what they wrote. *In re Okura & Co.*, 249 B.R. 596, 603 (Bankr.S.D.N.Y.2000); *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985); *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F.Supp. 401, 412–13 (S.D.N.Y.1994). "Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." *Okura*, 249 B.R. at 603; *Slatt*, 64 N.Y.2d at 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (internal quotes omitted). Whether or not a writing is ambiguous is a question of law to be resolved by the courts. *Okura*, 249 B.R. at 603; *Van Wagner Adver. Corp. v. S & M Enters.*, 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986).

If the contract language is "unambiguous," this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence. *Okura*,

249 B.R. at 603; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989).

■ The terms of the Participation Agreement "govern the relationship between the parties, unless the agreement is ambiguous." *Mason & Dixon Lines, Inc. v. First Nat'l Bank of Boston,* 86 B.R. 476, 478 (M.D.N.C.1988). In order to determine whether a phrase in the Participation Agreement is "ambiguous," it is necessary to consider it in the context of the entire Participation Agreement. *Okura,* 249 B.R. at 603; *Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (" 'particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.' " (quoting *William C. Atwater & Co. v. Panama R.R.,* 246 N.Y. 519, 524, 159 N.E. 418 (1927))). A phrase is ambiguous only if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Okura,* 249 B.R. at 603; *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (citations omitted).

Neither party disputes that the Participation Agreement is unambiguous. (Plaintiff's Memorandum of Law in Support of Summary Judgment (hereinafter "Pl.'s Mem.") at p. 3). Further, this Court

finds that the Participation Agreement is unambiguous. Therefore, this Court must give effect to the language used and will not refer to extrinsic evidence for its interpretation. *Okura,* 249 B.R. at 603; *Slatt,* 64 N.Y.2d at 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099.

BNL does not dispute the contents of Plaintiff's 7056–1 Statement.[8] However, BNL argues that HVB is not entitled to summary judgment on the basis of the facts contained in HVB's 7056–1 Statement and that there exist genuine issues of material facts which preclude summary judgment. BNL explains that in order for this Court to grant summary judgment, it must reject each of BNL's four affirmative defenses as a matter of law or find that BNL has failed to raise any genuine issues of material fact. (Third Supplemental Affidavit of Michael C. Lambert in Opposition to Motion (hereinafter "Third Supp. Lambert Aff.") ¶ 2).

The crux of the parties dispute centers on whether HVB adhered to contractual duties owed to BNL when it decided to honor the Green Country draft. This requires an analysis of the duties and obligations of HVB and BNL under the Participation Agreement and HVB's actions relative to the Participation Agreement.

### B. Terms of the Participation Agreement

The Participation Agreement at paragraph 2 sets forth the agreement of HVB and BNL, specifically it states that:

8. BNL's 7056–1 Statement explains at page 2 that: "BNL does not dispute the facts set forth in plaintiff's Rule 7056–1 Statement, but contends that plaintiff is not entitled summary judgment on the basis of those facts-that there exist genuine issues to be tried with respect to ... material facts which preclude summary judgment." Although BNL's position suggests a Rule 12(b)(6) argument with respect to

HVB's initial burden, BNL did not make a motion to dismiss. Moreover, with respect to BNL's burden, BNL articulates legal and factual arguments that could be understood to constitute a separate summary judgment motion by BNL. However, were this Court to treat BNL's argument as a motion to dismiss or summary judgment motion, HVB would still prevail for the reasons set forth below.

[HVB] will sell and transfer to [BNL] without recourse, and [BNL] will buy, assume and receive for its own risk, an undivided 100 percent interest ("Participating Percentage") in the [Letter of Credit] and any draw thereunder (a "Loan" and collectively with the [Letter of Credit], "Participation Interest"). [BNL] will assume its Participation Interest in the Letter of Credit and Loans, if any, when this Agreement becomes effective. Except as may otherwise be expressly provided in this Agreement, the obligations of [BNL] and [HVB] under this Section are irrevocable and unconditional.

(Cogan Decl. Exh. 2F at ¶ 2).

HVB sold a 100% participating interest in the Letter of Credit to BNL. (Affidavit of Leonardo Valentini in Opposition to Plaintiff's Motion (hereinafter "Valentini Aff.") ¶ 2). However, HVB retained "the sole right to administer the [Letter of Credit]." (Cogan Decl. Exh. 2F ¶ 4). Accordingly, in the event of a draw against the Letter of Credit, HVB was obligated to "promptly upon receipt of request for a [draw], notify [BNL] of the requested date and amount of such [draw]. [BNL would], on or before 10:00 a.m. (New York City time) on the date of such [draw], pay to [HVB], . . . the amount of [draw] in immediately available funds." (Cogan Decl. Exh. 2F ¶ 3). Therefore, HVB would administer the Letter of Credit and BNL would have a 100% participating interest entitling it to fees paid by Enron but obligating it to immediately reimburse HVB for any draw against the Letter of Credit.

Other than forwarding fees and providing certain information to BNL, the Participation Agreement at paragraph 4 expressly states that:

(a) [HVB] makes no representation or warranty, and none is to be implied, except the following: [HVB] is the issuer of the [Letter of Credit] and owner of the Participation Interests in the [Letter of Credit] and in any Loans already made, if any, and it has not received a notice of the type provided for in the [Master Letter of Credit] that an [(sic in original)] has occurred.

(b) [HVB] shall have the sole right to administer the [Letter of Credit] and any Loan and to enforce rights against [Enron Corp.], any guarantor or any collateral under the [Master Letter of Credit] or any related agreement or instrument, including the [Letter of Credit]. [HVB] may take any action in connection with such administration and enforcement of the [Letter of Credit] which [HVB] in its sole discretion deems proper (subject to Section 7 hereof), but in doing so it shall exercise the same care in the administration of the [Letter of Credit] as it would if it were the sole owner of it. [HVB] may consult with legal counsel (including counsel for [Enron Corp.], independent public accountants and other experts selected by it). All determinations and actions made or taken by [HVB] in respect of the [Letter of Credit] in good faith shall be conclusive and binding on [BNL].

(c) [HVB] shall have no obligation to [BNL] in respect of the Participating Interests, which is not expressly set forth in this Agreement.

(Cogan Decl. Exh. 2F at ¶ 4).

The Participation Agreement gave HVB substantial discretion to take action it deemed appropriate. The Participation Agreement at paragraph 7 also expressly states that:

(a) [HVB] reserves the right, in its sole discretion, in each instance, without prior notice to [BNL], to agree to the modification, waiver or release of any of the terms of the [Master Letter of Cred-

it], the [Letter of Credit], or any document relative thereto or to the release of any collateral, to consent to any action or failure by [Enron Corp.], and to exercise or refrain from exercising any powers or rights which [HVB] may have under or in respect of the [Master Letter of Credit], the [Letter of Credit], or any document relative thereto or any collateral therefor, including, without limitation, the right to enforce the obligations of [Enron Corp.] or any other party. [HVB] shall not, however, without [BNL's] prior written consent, exercise any such rights which would:

(i) increase the amount of the [Letter of Credit],

(ii) reduce the principal of, or interest accrued on, any [draw], or effect a reduction of interest which shall accrue on any [draw],

(iii) reduce any fee due in respect of the [Letter of Credit], or

(iv) postpone any date fixed for any payment of principal or interest on any [draw] or payment of a fee in respect of the [Letter of Credit], or waive any Event of Default based upon [Enron Corp.'s] failure to make such a payment timely.

(Cogan Decl. Exh. 2F at ¶ 7).

## C. HVB's Standard of Conduct As Set Forth Under the Participation Agreement

The terms of the Participation Agreement gave HVB "huge discretion" in acting under the underlying Master Letter of Credit between HVB and Enron Corp. (Valentini Aff. ¶ 3). However, as set forth in paragraph 4(b), and subject to paragraph 7 of the Participation Agreement,

HVB's discretion was subject to two qualifications.[9] First, HVB was required to exercise the same care with respect to the Letter of Credit as it would have if it had not sold a participating interest. Second, in order for actions to be binding on BNL, they must have been made in good faith. However, the Participation Agreement does provide that HVB may be liable for loss or damage caused by its gross negligence or willful misconduct.

### 1. HVB's Duty of Care Under the Participation Agreement

HVB, in its "sole discretion," was allowed to take "any action" with respect to the "administration and enforcement" of the Letter of Credit so long as when it took that action HVB exercised the same degree of care with respect to the Letter of Credit as it would have had it been the sole owner of the Letter of Credit. ("Duty of Care").

The Participation Agreement at paragraph 4(b) states, "[HVB shall have] the sole right to administer the [Letter of Credit and] ... may take any action in connection with such administration and enforcement of the [Letter of Credit] which [HVB] in its sole discretion deems proper ..., but in doing so it shall exercise the same care in the administration of the [Letter of Credit] as it would if it were the sole owner of it ..." In determining the application of the Duty of Care, this Court must give effect to the language used. The Participation Agreement uses the term "shall" to connote the mandatory nature of HVB's obligation to administer the Letter of Credit as it would if BNL had not purchased a participating interest.

---

**9.** BNL states that "[u]nder the Participation Agreement, HVB is obligated to both exercise the same care in the administration of the [letter of credit] as it would if it were the sole owner of the [letter of credit] (i.e., as if it had not transferred 100% of the exposure and risk to BNL) and to act in good faith." (Def.'s Mem. at 4; Valentini Aff. ¶ 2).

The Duty of Care standard refers to any action concerning the Letter of Credit by HVB, including the standard that would govern HVB's honoring of the Letter of Credit. Therefore, any action in connection with the administration and enforcement of the Letter of Credit is governed by the Duty of Care, the sole criteria of which required HVB to treat the Letter of Credit the same as it treated letters of credit where it was the sole owner.

The court in *American Bank & Trust of Coushatta v. Federal Deposit Ins. Corp.*, 49 F.3d 1064, 1069 (5th Cir.1995) considered a nearly identical provision in a participation agreement. The provision required that a lead bank "exercise the same care with respect to the loan ... as it gives to loans ... in which it alone is interested." *American Bank*, 49 F.3d at 1069. The court concluded that the provision was an "anti-discrimination standard, which requires the [lead bank] to treat the participant banks' loans the same as it treated its own loans." *American Bank*, 49 F.3d at 1069. The court further found that the anti-discrimination provision itself was not an implicit or an explicit negligence standard. *American Bank*, 49 F.3d at 1069.

As the court in *American Bank* found, so too this Court finds that the scope of the Duty of Care requires that HVB not treat the Letter of Credit any differently than it would have had BNL not purchased a participating interest in the Letter of Credit.

The Duty of Care does not require the Court to resort to letter of credit law to examine whether HVB did or did not discriminate against BNL. Moreover, the Duty of Care does not establish a negligence standard; therefore, with respect to the Duty of Care, this Court need not evaluate what a prudent banker would have done in HVB's position. As is more fully set forth below, the Duty of Care does however provide that HVB act pursuant to its usual course of conduct, even if its usual course of conduct could be considered negligent in light of an industry standard.

The conduct under scrutiny is HVB's administration of the Letter of Credit and any deviation from the manner in which it would have treated the Letter of Credit, as stated above, had BNL not participated in the Letter of Credit.

### 2. HVB's Good Faith Under the Participation Agreement

Also, "determinations and actions" taken in "good faith," with respect to the Letter of Credit, would be conclusive and binding on BNL. ("Good Faith"). Therefore, the Participation Agreement contains an explicit requirement to act in Good Faith. Specifically, it states that "[a]ll determinations and actions made or taken by [HVB] in respect of the [Letter of Credit] in good faith shall be conclusive and binding on [BNL]."

Unlike the Duty of Care, the Participation Agreement does not define "Good Faith." In determining the scope of Good Faith, this Court must give effect to the language used. HVB and BNL contracted to require that actions taken by HVB in Good Faith would be conclusive and binding on BNL. So long as HVB's determination/action—namely HVB's disbursement of funds under the Letter of Credit—was made in Good Faith, BNL would be bound by HVB's decision to pay the Letter of Credit.

As counsel for HVB urges, the Participation Agreement establishes that HVB's actions are held to a subjective Good Faith standard. (*See* Transcript of October 24, 2002 Hearing at 56–57). The obligation to act in Good Faith must be read in conjunction with the Duty of Care. Further, Good

Faith is understood in the context of HVB's administration of the Letter of Credit and the specific requirements of the Participation Agreement. As a result, in order to receive reimbursement from BNL, when HVB acted on the Letter of Credit draw, it must have done so in Good Faith.

### 3. Gross Negligence or Willful Misconduct

The Participation Agreement at paragraph (4)(d) establishes that HVB may be liable for loss or damage caused by gross negligence or willful misconduct. The section establishing the gross negligence or willful misconduct standard states that:

> [HVB shall not] be liable for any loss or damage caused by any error of judgment or any action taken or omitted on the part of [HVB] unless such loss or damage shall have been caused by gross negligence or wilful misconduct of [HVB].

(Cogan Decl. Exh. 2F at ¶ 4(d)).

Accordingly, HVB cannot incur any liability for conduct with respect to "loss or damage caused by any error of judgment or any action taken or omitted on the part of [HVB]," unless HVB acted in a manner that constituted gross negligence or willful misconduct.[10]

■ The Participation Agreement establishes liability in the event that HVB acted with gross negligence or willful misconduct. As stated previously, the Duty of Care requires that HVB "shall exercise the same care in the administration of the [Letter of Credit] as it would if it were the sole owner of it." Thus, BNL agreed to exculpate HVB from liability arising out of ordinary negligence but not gross negli-

gence or willful misconduct. *See Official Comm. of Unsecured Creditors of SMTK Expedite, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, Civ. 00–8688, 2002 WL 362794, at *8, 2002 U.S. Dist. LEXIS 3747, at *47 (S.D.N.Y. Mar. 6, 2002). Under New York law, unambiguous contractual clauses absolving a party for liability from its own ordinary negligence, such as is the case in the Participation Agreement, are enforceable. *Id.*

■ Gross negligence is defined as "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *American Telephone and Telegraph Co. v. City of New York et al.*, 83 F.3d 549, 556 (2d Cir.1996) (*quoting Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823–824, 595 N.Y.S.2d 381, 383, 611 N.E.2d 282 (1993)). To constitute gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.*, 204 F.Supp.2d 639, 645 (S.D.N.Y.2002) (*citing Curley v. AMR Corp., et al.*, 153 F.3d 5, 13 (2d Cir.1998) (*quoting* 79 N.Y. Jur.2d Negligence § 37 (1989))). In order to establish a prima facie case in gross negligence, it must be proven "by a fair preponderance of the credible evidence" that the party "not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness." *Travelers Indem. Co.*, 204 F.Supp.2d at 645 (*citing Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet*, 414 F.Supp. 153, 160 (S.D.N.Y.1975)). Under New York law, "a mistake or series of mistakes alone, without a showing of recklessness, is

---

10. Although, "loss or damage" is not defined, this Court reads these terms in a manner that is consistent with the entire Participation Agreement. The Court concludes that, in connection with the instant case, loss or damage refers to any loss or damage attributable to a draw on the Letter of Credit.

insufficient for a finding of gross negligence." *Travelers Indem. Co. of Conn.*, 204 F.Supp.2d at 645 (*citing American Telephone and Telegraph*, 83 F.3d at 549).

The Second Circuit has defined "willful misconduct" as:

the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or ... the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequence ... [or] the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission ...

*Berner v. British Commonwealth Pacific Airlines*, 346 F.2d 532, 536–37 (2d Cir. 1965); *Tavarez v. American Airlines, Inc.*, No. 96–2151, 1997 WL 695580, at *1, 1997 U.S. Dist. LEXIS 17507, at *2 (S.D.N.Y. Nov. 6, 1997); *Katz v. MCI Telecomm. Corp.*, 14 F.Supp.2d 271 (E.D.N.Y.1998); *International Mining Corp. v. Aerovias Nacionales De Colombia S.A.*, 57 A.D.2d 64, 393 N.Y.S.2d 405 (N.Y.App.Div.1977) (citing *Berner* with approval).

Therefore, in addition to the issues concerning the Duty of Care and Good Faith, BNL argues that there exists a material issue to be tried concerning the gross negligence and willful misconduct standards as set forth in the Participation Agreement. *But cf. Asian Vegetable Research and Dev. Ctr. v. Institute of International Educ.*, 944 F.Supp. 1169, 1181–82 (S.D.N.Y.1996) (explaining that plaintiffs' claim of gross negligence merely repeated its breach of contract claims).

### 4. Exclusion of Liability

The Participation Agreement at paragraph (4)(d) further establishes that HVB may not be responsible or liable in several circumstances. The provision that excludes HVB from liability states that:

Without limitation of the generality of the foregoing, [HVB] ... (ii) shall not be responsible for any statement, warranty or representation made in or in connection with the [Master Letter of Credit] or any document relative thereto or in any way for the financial condition of [Enron Corp.] or any guarantor or for the value of any collateral, (iii) shall not be responsible for the performance or observance of any of the terms, covenants, or conditions of the [Master Letter of Credit] on the part of [Enron]; (iv) shall not have any duty to inspect the property (including the books and records) of [Enron]; (v) shall not be responsible for the due execution, legality, validity, enforceability, genuineness or sufficiency of the [Master Letter of Credit], the [Letter of Credit] or any document relative thereto or any collateral therefor or for the collectability of sums due thereunder, and (vi) shall incur no liability under or in respect of the [Master Letter of Credit] or any such document or collateral by acting upon any notice, consent, certificate or other instrument or writing ... believed by [HVB] to be genuine and signed or sent by the proper party.

(Cogan Decl. Exh. 2F at ¶ 4(d)).

As explained above, the Participation Agreement establishes three standards to evaluate HVB's conduct: (i) the Duty of Care; (ii) obligation to act in Good Faith; and (iii) gross negligence and willful misconduct. However, paragraph 4(d) also sets forth that HVB will be excluded from liability and responsibility for enumerated, as well as unenumerated conduct. To the extent that BNL complains of conduct that is encompassed by this exclusion of liability, HVB's conduct is excused.

## D. Analysis

■ BNL asserts numerous factual and legal theories in support of its opposition to HVB's Motion. For the reasons set forth below, this Court grants HVB's Summary Judgment Motion.

### 1. HVB Complied With Its Obligations Under the Participation Agreement

The undisputed facts show that on December 3, 2001, HVB rejected Green Country's initial attempt to draw on the Letter of Credit due to technical non-conformance with the Letter of Credit. On December 4, 2001, Green Country re-submitted the draw documentation. Wynn determined that the re-submitted sight draft and draw certificate were compliant. Wynn determined that there were no grounds for declining payment, and accordingly, HVB paid Green Country $39,000,000 as requested in the sight draft.

In reaching the determination to approve payment of the Letter of Credit draw, Wynn was not aware that Cogentrix was the parent corporation of Green Country, or that HVB had any credits outstanding with Green Country/Cogentrix. Also, prior to the draw, Esposito was not aware of HVB's other lending relationships with Green Country/Cogentrix. Further, prior to the draw, DePaula did not have any communications with Esposito, or anyone else with HVB's Special Accounts Department concerning the draw on the Letter of Credit.

The Duty of Care required that HVB treat the Letter of Credit as it would have were it the sole owner of the Letter of Credit. The uncontroverted testimony of Wynn is that the Letter of Credit draw documents were processed in accordance with HVB's usual procedures. Further, nothing has been demonstrated that HVB did not act in Good Faith when it honored the Green Country draw documents. Based upon the undisputed facts, this Court finds that HVB has met its burden under the summary judgment standard.

BNL has neither adduced any facts nor established that further discover would be reasonably expected to create a genuine issue of material fact as to whether HVB breached its duties under the Participation Agreement. Specifically, whether HVB had information that, in exercising its Duty of Care and obligation to act in Good Faith, would have caused it to dishonor the Letter of Credit.

### 2. Cash Collateral

BNL asserts that HVB breached its duties under the Participation Agreement when it paid the draw because HVB did not demand cash collateral from Enron. (Answer ¶¶ 18–25). Specifically, BNL makes four arguments.

First, BNL argues that HVB breached the Duty of Care by not demanding cash collateral from Enron. (Defendant's 7056–1 Statement ¶¶ 11–12; Valentini Aff. ¶ 4). Second, BNL asserts that HVB breached the Duty of Care when it sought cash collateral for the PG & E and Williams letters of credit but not for the Enron Letter of Credit. (Third Supp. Lambert Aff. ¶ 16). Finally, BNL also argues that HVB should be held liable for acting with gross negligence or willful misconduct. (Defendant's 7056–1 Statement ¶ 11; Def.'s Mem. at n. 13). The Court finds these arguments are unpersuasive for several reasons.

HVB had no right to demand cash or any other collateral from Enron unless Enron defaulted. BNL refers to four possible instances of default under the Master Letter of Credit: (i) Enron's failure to abide by securities laws; (ii) Enron's failure to provide adequate financial statements; (iii) Enron's failure to reimburse

HVB for the draw; and (iv) Enron's bankruptcy filing on December 2, 2001.

The Participation Agreement at paragraph 4(d)(iv) states that "[HVB] shall not have any duty to inspect the property (including the books and records) of [Enron]." Therefore, pursuant to the Participation Agreement, HVB had no duty to inspect Enron's books and records and thus had no obligation to discover the alleged "failure to abide by securities laws" and "failure to provide adequate financial statements." Further, Enron's "failure to reimburse HVB for the draw" is an issue concerning default which arose subsequent to the draw.

Except for Enron's bankruptcy filing, the defaults cited by BNL became known in the course of events subsequent to Enron's bankruptcy filing. By the time those events had come to light, the automatic stay prevented HVB from making any such demand, let alone actually obtaining collateral. (Esposito Reply Aff. ¶ 3). Although HVB could have sought to lift the § 362(a) automatic stay to seek collateral, such action would have been pointless.

However, BNL argues that upon Enron's bankruptcy filing HVB should have requested cash collateral pursuant to the Master Letter of Credit. The Master Letter of Credit at paragraph 9.2 establishes Remedies Upon Event of Default. According to the Master Letter of Credit, once Enron filed for bankruptcy it triggered HVB's remedies under the default provisions in the Master Letter of Credit. The default provisions establishes Enron's immediate liability for reimbursement to HVB under the Master Letter of Credit. HVB, however, as stated above, was limited by the actions it could take once Enron filed for bankruptcy.

Finally, the Green Country Letter of Credit—though treated differently by HVB compared to the draws upon the PG & E and Williams letters of credit—was not treated in a discriminatory fashion. (Esposito Supp. Aff. ¶ 2). The PG & E and Williams letters of credit were partially collateralized because HVB required such at the time that Enron requested extensions on those letters of credit as each was approaching its respective expiration date. HVB, therefore had the right and ability to demand partial collateral on those two letters of credit as a condition for granting such an extension. (Esposito Third Supp. Reply Decl. ¶ 3). On October 29, 2001, at about the time HVB extended the PG & E and Williams letters of credit, HVB informed Enron that it would not extend nor issue any other letters of credit going forward. (Third Supp. Lambert Exh. F at 4). Both the PG & E letter of credit and the Williams letter of credit were due to expire on October 30, 2001, and both were collateralized on that same day. (Esposito Third Supp. Reply Decl. ¶ 3).

The Green Country Letter of Credit is distinguishable from the PG & E and Williams letters of credit because it was not due to expire until the end of December. (Esposito Third Supp. Reply Decl. ¶ 3). Thus, unlike the PG & E and the Williams letters of credit, prior to Enron's entry into bankruptcy, there was no opportunity to demand cash collateral. (Esposito Third Supp. Reply Decl. ¶ 3). Also, because the PG & E and Williams letters of credit were partially collateralized, Esposito's authorization was required in order to permit payment and drawdown of collateral. (Esposito Third Supp. Reply Decl. ¶ 4). Before approving the drawdown of the PG & E and Williams letters of credit, Wynn received express approval from Esposito in order to release collateralized funds. (Third Supp. Lambert Aff. ¶ 14).

This Court concludes that HVB did not breach its duties under the Participation Agreement when it did not request cash collateral from Enron even though it sought cash collateral for the PG & E and Williams letters of credit. Cash collateral was sought with respect to PG & E and Williams as a condition for extending the letters of credit—a circumstance that was not present with respect to the Green Country Letter of Credit. BNL has failed to raise any issues of law or genuine issues of material fact with respect to the cash collateral issue.

### 3. HVB Allegedly Honored "Fraudulent" Draw Documents

BNL argues that HVB "knew or is charged with knowledge" that NEPCO was not in default under the E & C Agreement and the EP Agreement and should have therefore refused to pay the draw. Accordingly, BNL asserts that HVB paid the draw despite allegedly possessing knowledge that the Green Country draw documents were "fraudulent."

BNL argues that HVB breached the Duty of Care, its obligation to act in Good Faith, and the duty of loyalty. (Answer ¶¶ 33–34; Def.'s Mem. at 16; Supplemental Lambert Aff. ¶ 25).

This Court must consider whether HVB's honor of the draw documents resulted in a breach of the Participation Agreement.

### i. BNL Consults With HVB

BNL argues that HVB failed to consult with BNL and prudence would have led HVB to have done so in this case. (Valentini Aff. ¶ 5). BNL states that there is no evidence that HVB reviewed the Green Country Letter of Credit file. (Valentini Aff. ¶ 6).

This position is contradicted by Carlo Vecchi, Senior Vice President of BNL ("Vecchi"). According to Vecchi, prior to the draw on December 4, 2001, BNL and HVB had several contacts concerning Green Country's attempt to drawdown the Letter of Credit. (Supplemental Affidavit of Carlo Vecchi (hereinafter "Vecchi Supp. Aff.") ¶¶ 25–31). Vecchi visited the website of Cogentrix and researched the Jenks Plant and concluded that the $39,000,000 Letter of Credit was approximately 10% of the construction cost of the plant. (Vecchi Supp. Aff. ¶ 27). Vecchi understood the website to feature a photograph of the "completed" Jenks Plant to begin commercial operation in January 2002. (Vecchi Supp. Aff. ¶ 27). However, the website stated that the Jenks Plant was "currently under construction" and commercial operations were merely "projected" for December 2001. (Affidavit of Michael C. Lambert in Opposition to Plaintiff's Motion ¶ 4, Exh. D). Nonetheless, in light of the indeterminate statements contained on the website, Vecchi could not understand why the Letter of Credit was being drawn when the Jenks Plant looked finished and was scheduled for commercial operation. (Vecchi Supp. Aff. ¶ 27). Thus, Vecchi concluded that the bona fides of the draw was suspect. (Vecchi Supp. Aff. ¶ 28). Based upon the website content, according to Vecchi, BNL adopted two positions concerning any attempt to drawdown the Letter of Credit. (Vecchi Supp. Aff. ¶¶ 29–30).

First, BNL suspected that Green Country was drawing on the Letter of Credit because of Enron's bankruptcy filing, and therefore, BNL offered to issue a replacement letter of credit with a long enough maturity date to satisfy the beneficiary and to allow an investigation. (Vecchi Supp. Aff. ¶ 29). BNL argues that because of its offer to replace the Letter of Credit, no prudent banker would have paid under the circumstances, especially with

the alleged haste with which HVB acted. (Third Supp. Lambert Aff. ¶ 10). However, according to Wynn she did not act in haste, rather she acted consistent with the Duty of Care and obligation to act in Good Faith. In addition to declining the first request for payment, upon receipt of the second draw request Wynn did not act immediately, rather she received the corrected draw documents at 10:00 a.m. and withheld payment of the draw until just before the close of business on the day that the draw was to be paid.

Also, despite BNL's urgings, HVB did not attempt to contact Green Country or NEPCO to convey BNL's willingness to issue a replacement letter of credit to Green Country. (Third Supp. Lambert Aff. ¶ 7). However, BNL was in contact with Green Country concerning the offer to issue a replacement letter of credit. (Reply Declaration of Jeffrey S. Lowenthal (hereinafter "Lowenthal Reply Decl.") Exh. A). BNL's offer to replace the Letter of Credit was not an offer that HVB was required to facilitate or even consider. (Affidavit of Richard A. Bertocci (hereinafter "Bertocci Aff.") ¶ 3). It was not up to HVB to accept a replacement letter of credit, rather, it was a decision that only Green Country could make. HVB's conduct regarding BNL's offer to replace the Letter of Credit did not result in a breach of the Participation Agreement.

Second, by the late afternoon of December 3, 2001, the day before HVB paid the Letter of Credit, BNL's position was that, regardless of whether there was strict compliance with the draw documents, there was substantial evidence that honoring the presentation would facilitate a material fraud by Green Country on HVB and/or on Enron and NEPCO. (Vecchi Supp. Aff. ¶ 30; Third Supp. Lambert Aff. ¶ 5). Specifically, Vecchi put HVB on notice that the draw request from Green Country was potentially wrongful on grounds that 100% of a performance letter of credit was being drawn on a project that was virtually complete. (Defendant's 7056–1 Statement ¶ 9).

Esposito apparently never advised Wynn of HVB's conversations with counsel and BNL regarding BNL's concerns over the completion status of the Jenks Plant. (Third Supp. Lambert Aff. ¶ 6). Moreover, Esposito gave the Letter of Credit draw documents to HVB's outside counsel to review before Wynn paid the draw. (Esposito Dep. Tr. 36–37). According to BNL, Esposito did nothing to prevent the payment of the Letter of Credit despite (i) his knowledge of the content on the Cogentrix website which set forth the 98% completion figure, and (ii) HVB's apparent statutory ability to not pay under § 5–109(a)(2) of New York's commercial code. (Third Supp. Lambert Aff. ¶ 8). At first blush, the question arises whether HVB acted consistent with the Duty of Care and obligation to act in Good Faith when Esposito did not tell Wynn of BNL's concerns. As explained above, Wynn did not have independent knowledge of HVB's Green Country/Cogentrix loan portfolio. This Court finds however, for the reasons set forth below, that Esposito's decision not to communicate BNL's concerns to Wynn did not cause HVB to breach its duties under the Participation Agreement.

First, BNL's conversations with HVB concerning the alleged fraudulent overdraw was ultimately a component of discussions between counsel for HVB and BNL. There is no indication that once counsel vetted BNL's concerns and decided that it would not follow BNL's advice, that HVB was then obligated to pass the information down to the Letter of Credit Department or that passing such information along would have been consistent with HVB's usual conduct. Further, Wynn has

testified that she did not regularly consult counsel when she reviewed letters of credit.

Second, although BNL offered to issue a replacement letter of credit, that offer was contingent upon HVB not honoring the Letter of Credit draw and exercising its discretionary option not to honor a letter of credit draw pursuant to § 5–109(a)(2). However, had HVB been found to have wrongly declined the Letter of Credit draw, then HVB would have been liable. From the record before the Court there is no indication that BNL's request that HVB decline the Letter of Credit draw was formalized with an agreement to fully indemnify HVB in the event that HVB was found to have wrongly declined payment on the draw based upon BNL's request not to honor the draw. (Lowenthal Reply Decl. ¶¶ 3, 7). According to the affidavit of Richard A. Bertocci, counsel for BNL, during a telephone conversation with counsel for HVB on December 3, 2002, Bertocci explained to counsel for HVB that paragraph 3(c) of the Participation Agreement functioned to provide indemnification under the circumstances. (Bertocci Aff. ¶ 3). Paragraph 3(c) provides that:

> [BNL] will on request reimburse [HVB] for any and all costs and expenses incurred by [HVB] in connection with a [draw] or the [Letter of Credit], or any collateral, guaranty or other support for a [draw] or the [Letter of Credit], and any action which may be taken by [HVB] to collect sums due in connection with a [draw], for which [HVB] shall not have been reimbursed by or on behalf of [Enron].

This provision of the Participation Agreement certainly makes BNL liable for reimbursement. However, indemnification in the event of wrongful dishonor is arguably outside the scope of the Participation Agreement. Rather than enter into a for-mal agreement to indemnify HVB, BNL's offer, premised on its interpretation of paragraph 3(c) (to the exclusion of paragraph 4(d)) simply created more uncertainty for HVB. Such uncertainty is at odds with the purpose of interbank agreements such as participation agreements and this Court need not weigh the implications of HVB's decision not to dishonor at the direction of BNL.

Third, BNL's major contention is that HVB did not abide by the information provided by BNL to HVB. However, there is no indication that HVB was obligated to take BNL's advice under the circumstances. The draw certificate describes a performance default by NEPCO; however, three facts external to the draw certificate led BNL to conclude that Green Country was attempting to fraudulently draw. BNL learned of the 98% completion status of the Jenks Plant by looking at the Cogentrix website. The website also explained that the Jenks Plant was "currently under construction" and commercial operations were merely "projected" for December 2001. Also, BNL calculated that the Letter of Credit draw was 10% of the total project cost.

BNL interpreted these facts to mean that NEPCO had not defaulted and that HVB should dishonor the draw despite time constraints HVB faced for honoring the Letter of Credit draw. There is no indication that BNL could have concluded that the 98% completion figure bore any meaningful economic correlation to 10% of the project cost for the Jenks Plant. Moreover, the website indicated that the Jenks Plant was "under construction." This statement does not signify that the Jenks Plant was complete. Further, there is proof that BNL understood that the Jenks Plant was not complete. In an e-mail from counsel for BNL to counsel for Green Country, BNL explains that "BNL

confirms that it will reissue the [Letter of Credit] in its own name for a maturity which will allow the project to be completed." (Lowenthal Reply Decl. Exh. A). There is nothing in the record that would establish a direct relationship between the percentage of completion and the percentage of cost that may relate to completing the Jenks Plant.

Finally, the Participation Agreement provided HVB with substantial discretion and allowed it to exercise its judgment. There has been no proof offered that would suggest that HVB's decision to either honor the draw certificate or its decision not to grant BNL's request constituted a failure to comply with duties under the Participation Agreement.

▆▆▆ Further, although letter of credit law is not the applicable standard under the Participation Agreement (unless such was part of the usual procedures of HVB in handling letters of credit), from a practical standpoint HVB's usual procedures would have to be substantially consistent with letter of credit law. Central to letter of credit law is the principle that an issuing bank does not have a duty to look behind draw documents when the draw documents comply on their face to the requisites of the letter of credit. (See Def.'s Mem. at 22). When HVB honored the Letter of Credit, it had no legal duty to inquire beyond the draw documents. HVB's obligations under letter of credit law permitted it to honor the request for disbursement of funds. The principle of independent contracts is an essential aspect of letter of credit transactions. Nothing has been shown that would tend to demonstrate that HVB failed to comply with its statutory and contractual obligations.

BNL has not demonstrated any genuine issue of material fact or law that shows HVB failed to abide by the terms of the Participation Agreement when it honored the draw documents.

### ii. Alleged Documentary Proof

According to BNL, several documents demonstrate that HVB "knew, or is charged with knowledge" that Green Country could not possibly be damaged in the amount of $39,000,000 and that its request for a full drawdown of the Letter of Credit was wrongful. (Defendant's 7056–1 Statement ¶¶ 8–9).

First, a report sent to HVB from the project finance syndicate lead bank dated November 2001 states that the Jenks Plant was 98% finished. (Supplemental Lambert Aff. Exh. E). Second, BNL asserts that a December 7, 2001 memorandum from Bank of America (the leader of the project finance syndicate) to the lending group also refers to the Jenks Plant and the bankruptcy filing of Enron. (Second Supplemental Affidavit of Michael C. Lambert (hereinafter "Second Supp. Lambert Aff.") Exh. B). Third, an HVB e-mail identifying certain project finance exposures of HVB dated December 13, 2001 stating that the Jenks Plant was "near completion" and that drawdown funds from letters of credit were on deposit with an agent bank. (Second Supp. Lambert Aff. Exh. C). Fourth, BNL asserts that handwritten notes from HVB's files appear to be of a conference call that took place on December 18, 2001 concerning the Jenks Plant. (Second Supp. Lambert Aff. Exh. A). Fifth, an internal HVB Project Finance memorandum dated February 28, 2002, identifies damages of $2,100,000 for delay against which the $53,020,000 in letter of credit proceeds were being held by Green Country/Cogentrix. (Supplemental Lambert Aff. Exh. F).

This Court notes that four of the five documents listed above and that BNL relies upon: memorandum dated December

7, 2001; e-mail dated December 13, 2001; conference call notes from December 18, 2001; and internal HVB memorandum dated February 28, 2002 are documents that were drafted after the December 4, 2001 draw on the Letter of Credit occurred. These documents do not create a genuine issue of material fact concerning HVB's conduct with respect to the draw.

As for the document dated prior to the December 4, 2001 draw, the report produced from HVB's files, the Green Country Energy Project Monthly Summary Memo dated November 30, 2001, it was circulated by the Jenks Plant project finance syndicate agent bank in February 2002, approximately two months after the Letter of Credit had been drawn. (DePaula Supp. Aff. ¶ 4). Moreover, DePaula testified that she did not know that the Letter of Credit had been issued until January 8, 2002 by notification of the project finance syndicate agent bank. (DePaula Supp. Aff. ¶ 3). The documents do nothing to create a genuine issue of material fact with respect to those statements by DePaula.[11]

In an attempt to assail the credibility of DePaula's testimony—that she did not see the November 2001 report until it was posted in February 2002—and to create an issue of fact, BNL asserts that handwritten notes from HVB's files appear to be of a conference call that took place on December 18, 2001 concerning the Jenks Plant. (Second Supp. Lambert Aff. Exh. A). BNL argues that the notes demonstrate that HVB knew of the "98%" estimated completion by at least mid-Decem-

ber 2001. (Second Supp. Lambert Aff. Exh. A). Again, the December 18, 2001 conference call occurred after the Letter of Credit draw and there is no indication that DePaula participated in the conference call.

Nonetheless, DePaula's Affidavit establishes that she knew of the completion percentage by February 2002, but that in terms of project finance risks, 98% completion does not present any reassurance that the project is complete. From HVB's Project Finance perspective, 98% completion could leave very substantial funding needs outstanding and could expose banks to potential risks. (DePaula Supp. Aff. ¶ 5). The November progress memo contrasts the "estimated" 98% completion status against 68% of start-up progress. (Supplemental Lambert Aff. Exh. E). The failure of the Jenks Plant to achieve commercial operation by a date certain could have exposed the Jenks Plant, and ultimately the project finance syndicate, to substantial, additional cost-overruns. (DePaula Supp. Aff. ¶ 5).

Although the Jenks Plant achieved commercial operation on February 11, 2002, that did not mark the end of the construction loan phase of the project financing, as numerous punch-list items remained and operational reliability tests needed to be performed before the Jenks Plant could be certified as complete. (DePaula Supp. Aff. ¶ 6). The project finance syndicate did not convert the construction loan into an amortizing loan until after receiving the Completion Certificate. (DePaula Supp. Aff. ¶ 6). The conversion date, from construc-

---

11. Furthermore, even if the documents did create an issue of fact, this Court would not find it to be material as DePaula's affidavit establishes that she was not involved in the decision to honor the Letter of Credit. Whatever knowledge DePaula may have had prior to or subsequent to the draw is not material to whether HVB observed the Duty of Care or

acted in Good Faith, unless it was HVB's usual conduct to bring such information to the Letter of Credit Department's attention—an allegation that has not been made. However, nothing has been demonstrated that would tend to show that DePaula had any knowledge concerning the Letter of Credit prior to the draw.

tion loan to amortizing term loan, occurred on or about June 14, 2002. (DePaula Supp. Aff. ¶ 6). On December 18, 2002, nearly one year after the Letter of Credit draw, HVB received notice of the Jenks Plant final completion. (Esposito Third Supp. Reply Decl. ¶ 6).

Therefore, from DePaula's perspective, even if she knew that the Jenks Plant was 98% complete, it would not have caused her to believe that the Jenks Plant was in fact complete. Moreover, as explained above, according to DePaula's testimony she did not learn of the fact that HVB had issued the Letter of Credit until January 8, 2002.

BNL also asserts that a December 7, 2001 memorandum from HVB's files from Bank of America (the leader of the project finance syndicate) to the lending group also refers to the Jenks Plant and the bankruptcy filing of Enron. (Second Supp. Lambert Aff. Exh. B). Despite BNL's interpretation of the document, the memorandum makes no discernible reference to the status of completion of the Jenks Plant; rather, the memorandum advises that efforts were being made to "facilitate timely completion" of the Jenks Plant. (Second Supp. Lambert Aff. Exh. B). This memorandum would not have provided any indication to the Project Finance Group that the Jenks Plant was to the stage of completion that BNL suggests is indicated by the document.

BNL has not demonstrated any genuine issue of material fact that shows HVB failed to abide by the terms of the Participation Agreement when it honored the draw in light of information concerning the extent of damages sustained by Green Country.

### iii. Fraudulent Draw Certificate

BNL argues that HVB failed to detect whether the draw certificate presented to HVB by Green Country cited a default under the E & C Agreement and the EP Agreement. (Defendant's 7056–1 Statement ¶ 6). BNL asserts that HVB "knew, or is charged with knowledge" that the alleged default cited in Green Country's draw certificate could not be true because the draw certificate was not consistent with language from the E & C Agreement and the EP Agreement (which HVB had in its files) and the amendments to those agreements. Thus, BNL argues that HVB should not have paid the drawdown.

The draw certificate, dated December 4, 2001, states in relevant part:

> The Contractor has failed to perform in accordance with Sections 6.2 and 6.3 of the *Amended and Restated Engineering Procurement and Construction Contract* dated November 1, 1999, between Green Country Energy, LLC and National Energy Production Corporation and NEPCO Procurement Company . . .

(Emphasis added) (Cogan Decl. Exh. 2H).

In order to understand BNL's argument it is helpful to review the language contained in the amendments. The amendments at attachment 1 state:

> 6.3 *Security.* As additional security for the performance of [NEPCO's] obligations hereunder and the obligations of [NEPCO Green Country] has *drawn* on certain letters of credit provided by or on behalf of [NEPCO] in the aggregate amount of $53,020,000 (the "Security Amount"). The Security Amount shall secure the obligations of [NEPCO] to perform its obligations under this Agreement and to pay the amount of any damages suffered by [Green Country] that arise out of this Agreement.

(Emphasis added) (Supplemental Lambert Aff. Exh. I, J). The amendments modify the provisions in the E & C Agreement and the EP Agreement which obligated NEPCO and Enron to post letters of cred-

it in lieu of retainage. The amendments do not purport to amend section 6.2 (dealing with liquidated damages) of the E & C Agreement and the EP Agreement. Although section 6.3 was modified, the amendments did not function to alter the sequence of the sections or the fundamental purposes of the sections.

BNL relies on the contract titles and the amendments in order to challenge HVB's decision to honor the draw. An analysis of this issue in light of letter of credit law would result in a finding that HVB had no duty to look beyond facially compliant documents. More importantly, however, BNL's arguments are unpersuasive in light of HVB's duties under the Participation Agreement to act consistent with its usual procedures which the Court has found were followed.

### a. Contract Name on the Draw Certificate

BNL argues that HVB knew or is chargeable with knowledge that the draw certificate presented by Green Country was false in that it cited NEPCO's default under provisions of a nonexistent "Amended and Restated Construction Contract." [12] (Defendant's 7056–1 Statement ¶ 7).

BNL argues that an Amended and Restated Engineering Procurement and Construction Contract "did not exist in the form cited" and correctly asserts that there are two separate contracts, the E & C Agreement and the EP Agreement with amendments. BNL argues that the draw certificate was fraudulent because it referred to an "Amended and Restated Engineering Procurement and Construction Contract."

The Letter of Credit states the information that the draw certificate was required to include. Referring to the underlying contracts, the Letter of Credit contains the following language: "insert relevant sections of the EPC Contract." (See *supra* n. 4).

The Letter of Credit instructs Green Country to insert the sections of the contract that are relevant. The Court understands this to mean that the key information necessary for the draw certificate was that Green Country needed to include relevant contract sections. Green Country did in fact include the relevant sections in the draw certificate.

Although there were two contracts, the E & C Agreement and the EP Agreement (amended effective December 1, 2001), the Letter of Credit refers to an "EPC Contract." Based upon the record before this Court an "EPC Contract" never existed. Neither the Letter of Credit directions nor the draw certificate accurately reflect the name the parties ascribed to the E & C Agreement and the EP Agreement. However, the draw certificate referred to an Amended and Restated Engineering Procurement and Construction Contract instead of the E & C Agreement and the EP Agreement as amended. As will be discussed more fully below, the Participation Agreement did not require that HVB investigate facially conforming statements in the draw certificate.

### b. Amendments to the Underlying Contracts

BNL argues that HVB had copies of the E & C Agreement and the EP Agreement and the amendments thereto and therefore knew or is chargeable with knowledge that

---

**12.** BNL's 7056–1 Statement at paragraph 7 refers to the contract cited in the draw certificate as the "Amended and Restated Construction Contract;" however, the draw certificate refers to an "Amended and Restated Engi-neering Procurement and Construction Contract." The Court assumes BNL intended to quote the language in the draw certificate and not to refer to yet another articulation of the contracts in question.

NEPCO was not in default under the relevant sections of the contracts. (Defendant's 7056–1 Statement ¶ 7; Supplemental Lambert Aff. ¶¶ 15–20).

BNL argues two points: (i) that the draw certificate refers to an Amended and Restated Engineering Procurement and Construction Contract "which did not exist in the form cited," and (ii) that the amendment to the E & C Agreement and the EP Agreement refers to the Letter of Credit as having been already drawn. BNL attempts to argue that these two facts make it impossible for Green Country to have properly alleged a default warranting a drawdown. BNL further argues that HVB should have known about these documents because some department of HVB possessed these documents. Moreover, BNL argues that HVB should have interpreted these documents to understand that Green Country/Cogentrix and NEPCO was perpetrating a scheme to overdraw on the Letter of Credit.

Although BNL argues that HVB produced copies of the E & C Agreement and the EP Agreement and the amendments to those agreements, Esposito testified that at about the same time Wynn honored the draw, Esposito himself examined the files he had access to and did not find the E & C Agreement and the EP Agreement or the amendments to those agreements. (Esposito Dep. Tr. 61–66). There is no indication that the Letter of Credit Department, in the usual course of its affairs, would have had ready access to the E & C Agreement and the EP Agreement or the amendments to those agreements.

The Court concludes that BNL has failed to demonstrate that HVB was obligated to confirm the accuracy of the content of the draw certificate.

### c. HVB is not Responsible for Fraudulent Draws

Finally, the Court observes that the Participation Agreement at paragraph 4 establishes that HVB "shall not be responsible for the due execution, legality, validity, enforceability, genuineness or sufficiency of the [Master Letter of Credit], the [Letter of Credit] or any document relative thereto or any collateral therefor or for the collectability of sums due thereunder, and ... shall incur no liability under or in respect of the [Master Letter of Credit] or any such document or collateral by acting upon any notice, consent, certificate or other instrument or writing ... believed by [HVB] to be genuine and signed or sent by the proper party." Thus, the Participation Agreement relieved HVB from potential liability for honoring an allegedly fraudulent draw certificate.

### d. Summary

The Court finds that BNL has failed to demonstrate any genuine issues of material fact regarding HVB's decision to honor the draw certificate. Based upon a review of the relevant facts, the Court finds that HVB did not breach its duties under the Participation Agreement.

### 4. HVB Allegedly Honored "Non-Conforming" Draw Documents

BNL asserts that HVB knowingly paid non-conforming draw documents submitted by Green Country. Specifically, BNL asserts that the draw documents submitted by Green Country did not meet the requirements of the Letter of Credit, the Uniform Customs and Practice for Documentary Credits, and the laws of the State of New York. (Answer ¶¶ 11–17; Defendant's 7056–1 Statement ¶¶ 1, 2, 11; Def.'s Mem. at n. 13). BNL asserts that HVB's alleged failure to dishonor the draw documents constituted a breach of the Duty of Care and obligation to act in Good Faith and was conduct that amounted to gross negligence and willful misconduct.

In support of its argument that the draw documents were non-conforming, BNL submitted the affidavit of Thomas Badolato, head of the Letter of Credit Department at BNL's New York branch ("Badolato"). According to Badolato, the sight draft contained two fatal infirmities. First, the sight draft did not identify the drawee. Second, the sight draft was not negotiable because it included payment instructions (address for wiring of funds). (Affidavit of Thomas Badolato in Opposition to Plaintiff's Motion (hereinafter "Badolato Aff.") ¶ 8). Badolato testified that:

> In early December 2001, I was called by BNL senior management to a conference room at BNL and, with no introduction or explanation, shown a telefax of what purported to be a sight draft . . . I was asked if I saw anything wrong with the document. This was an unusual occurrence and I was a little nervous, not knowing whether the senior executives wanted the draft to be good or bad, so I just scanned it and blurted out "It's not addressed to anyone." The defect was so immediately apparent that any junior document checker would have spotted it.

(Badolato Aff. ¶ 3).

Thus, Badolato's testimony is that the draw documents were legally non-conforming. Badolato states in his affidavit however that he is not qualified to render a legal analysis of draw documents:

> Letter of credit clerks are not lawyers; I do not know the theoretical background for much of what I know and do. My job is to know that documents on their face comply with *stipulated conditions* in accordance with international standard banking practice.

(Emphasis added) (Badolato Aff. ¶ 6). Badolato's own Affidavit explains that "stipulated conditions" must be followed by draw documents. Badolato however did not know what those stipulated conditions were because, as his testimony suggests, he was not provided with the Letter of Credit. To the extent that Badolato's testimony is intended to demonstrate industry practice, it is not relevant because HVB's conduct is evaluated pursuant to the Duty of Care and obligation to act in Good Faith in accordance with the Participation Agreement.

Moreover, two provisions of the Participation Agreement establish that even if the draw documents did not comply with the terms of the Letter of Credit, BNL had no right under the Participation Agreement to refuse reimbursement. Paragraph 4 of the Participation Agreement states HVB "shall not be responsible for the due execution, legality, validity, enforceability, genuineness or sufficiency of the [Master Letter of Credit], the [Letter of Credit] or any document relative thereto or any collateral therefor or for the collectability of sums due thereunder, and . . . shall incur no liability under or in respect of the [Master Letter of Credit] or any such document or collateral by acting upon any notice, consent, certificate or other instrument or writing . . . believed by [HVB] to be genuine and signed or sent by the proper party." Further, paragraph 7 of the Participation Agreement states HVB may "exercise or refrain from exercising any powers or rights which [HVB] may have under or in respect of the [Master Letter of Credit], the [Letter of Credit], or any document relative thereto or any collateral therefor, including, without limitation, the right to enforce the obligations of [Enron Corp.] or any other party."

The Participation Agreement establishes that (with respect to the relationship between HVB and BNL) payment on the Letter of Credit was in HVB's sound discretion. The parameters of HVB's duties

are established by the Participation Agreement and not letter of credit law. Therefore, BNL's raising of issues concerning technical non-compliance with the requirements of the Letter of Credit is not relevant to the applicable standard of the Participation Agreement. BNL has not adduced any facts that demonstrate gross negligence or willful misconduct. BNL charges that HVB failed to abide by the Duty of Care and obligation to act in Good Faith with respect to the decision to honor the draw.[13] The uncontroverted testimony and affidavits of Wynn and Esposito demonstrate that HVB observed the Duty of Care and obligation to act in Good Faith.

Although BNL's opposition raises issues concerning, *inter alia,* application of letter of credit law, that is not the standard of care that governs the duties owed by HVB to BNL. As reflected in the Participation Agreement, the parties bargained for a standard dependent upon HVB's usual conduct. BNL has failed to demonstrate a genuine issue as to any material fact with respect to HVB's conduct under the Participation Agreement. The Participation Agreement did not require HVB to act consistent with letter of credit law. Therefore, because a violation of letter of credit law that would otherwise not be inconsistent with HVB's "usual procedures" does not constitute a breach of the Participation Agreement, this Court finds that BNL's argument on the issue of nonconforming draw documents lacks merit.[14]

BNL does not establish that HVB's decision to honor the draw documents constituted a breach of the Participation Agreement. Also, BNL has not demonstrated a triable issue of fact with respect to HVB's obligations under the Participation Agreement. Finally, BNL has not demonstrated that additional discovery is reasonably expected to create a genuine issue of material fact.

## 5. Alleged "Scheme to Overdraw"

BNL also alleges that NEPCO and Cogentrix conceived a scheme to overdraw on the Letter of Credit so that Cogentrix would have sufficient funds in order to complete the other projects involving NEPCO. (Supplemental Lambert Aff. ¶¶ 21–24).

This Court must consider whether the alleged scheme to overdraw resulted in a breach of the Participation Agreement.

BNL argues that documentary evidence demonstrates that on November 29, 2001, NEPCO had a "strategic discussion" in which it expressed a desire to stay out of bankruptcy and outlined a plan whereby the Jenks Plant Letter of Credit proceeds would be applied, *inter alia,* to two of the other Cogentrix projects in which NEPCO was involved. (Supplemental Lambert Aff. Exh. L). BNL further asserts that the scheme to overdraw was carried out and is evidenced by an internal NEPCO/Enron memo from a meeting held on February 22, 2002. Also, BNL asserts that NEPCO and Cogentrix had a "scheme" to overdraw the Letter of Cred-

---

**13.** BNL also argues that HVB's failure to require conforming documents prior to payment provides a defense to a claim against Enron for reimbursement in the amount paid by HVB. This, BNL argues provides BNL with a defense to HVB's claim for reimbursement. (Answer ¶ 14). Because the Court finds that HVB abided by its duties under the Participation Agreement, this argument is unpersuasive.

**14.** The Court recognizes that, regardless of HVB's duties under the Participation Agreement, Enron and Green Country could arguably maintain a cause of action regarding the letter of credit for violations of, *inter alia*, letter of credit law. However, the issue before this Court, involves an analysis of the respective rights and duties of HVB and BNL vis-a-vis the Participation Agreement, not letter of credit law.

it, and even if HVB did not know of the scheme, it should have known that Green Country would not have been entitled to the entire $39,000,000 draw. According to BNL, Cogentrix intended to create a fund to complete other projects. (Third Supp. Lambert Aff. ¶ 9). In order to achieve that purpose, Cogentrix drew a total of $53,020,000 in letters of credit on the Green Country project although it believed that actual amounts needed to complete the Jenks Plant would be less than $7,000,000. (Supplemental Lambert Aff. Exhs. L, M; Third Supp. Lambert Aff. ¶ 9).

BNL alleges that Green Country/Cogentrix and NEPCO conspired to allow the terms and conditions of the Letter of Credit to be ignored so that an unjustified presentation could be made under the Letter of Credit without NEPCO's objection, thus violating UCP 500 which requires an issuer's consent to the amendment of a letter of credit. (Defendant's 7056–1 Statement ¶ 10).

The question of whether Green Country/Cogentrix and NEPCO "conspired" or had a "scheme" to overdraw on letters of credit is one that is beyond the instant dispute concerning BNL's liability to HVB on the Participation Agreement. Furthermore, BNL has not shown that HVB knew or had any obligation to know or investigate the alleged "scheme" to overdraw letters of credit. The Participation Agreement at paragraph 4(d)(iv) states that HVB "shall not have any duty to inspect the property (including the books and records) of [Enron]."

BNL has not advanced any facts that might demonstrate that HVB was aware or should have been aware, of the alleged scheme to overdraw prior to paying on the Letter of Credit, or that it was under a duty to discover the alleged scheme.

### 6. HVB's Alleged Gross Negligence or Willful Misconduct

BNL argues that HVB can be held liable for acting with gross negligence or willful misconduct. (Defendant's 7056–1 Statement ¶ 11; Def.'s Mem. at n. 13). BNL argues that summary judgment should be denied because there are genuine issues as to material facts with respect to whether HVB acted with gross negligence or willful misconduct. The Court notes that BNL did not plead gross negligence and willful misconduct but raised the issue in its 7056–1 Statement and Memorandum of Law.

Nonetheless, BNL's responsive papers seem to argue that HVB acted with gross negligence and willful misconduct when: (i) HVB paid on non-conforming draw documents; (ii) HVB failed to seek cash collateral; (iii) HVB failed to take action to protect its rights or recover the $39,000,000 draw. (Defendant's 7056–1 Statement ¶ 11). Also, as a component to the conflict of interest argument, that HVB failed to investigate what was an alleged fraudulent draw. (Supplemental Lambert Aff. ¶ 25).

It is this Court's "role on a motion for summary judgment ... to determine whether there is a material issue to be tried." *Charter Oak Fire Ins. Co. v. Trio Realty Co.*, No. 99–10827, 2002 WL 123506, at *5, 2002 U.S. Dist. LEXIS 1442, at *8 (S.D.N.Y. Jan. 31, 2002). Additionally, "where different conclusions can be drawn from the evidence the motion should be denied." *Id.*

BNL charges HVB acted with gross negligence or willful misconduct which is conduct that resembles reckless or intentional wrongdoing. Despite BNL's summary conclusion that the "inescapable conclusion is HVB acted in bad faith in order to obtain subordinate new money from BNL to secure its own senior exposure to

Cogentrix and its related entities" (Supplemental Lambert Aff. ¶ 25), BNL does not allege that HVB's conduct was (i) reckless, (ii) with knowledge that HVB's actions or omissions probably would result in damage or injury, or (iii) in a manner that implied a reckless disregard of the probable consequences. BNL's allegations do not amount to more than allegations ordinary breach of an ordinary duty of care. BNL's allegations do not rise to the level of conduct that satisfies the gross negligence and willful misconduct standard as a matter or law.

Further, BNL's allegations deal with conduct that either (i) the Participation Agreement either exculpates HVB from liability for, or (ii) conduct that does not even amount to a breach of the Participation Agreement. *See generally, Asian Vegetable Research and Dev. Ctr. v. Institute of International Educ.*, 944 F.Supp. 1169, 1181–82 (S.D.N.Y.1996) (explaining that plaintiffs' claim of gross negligence merely repeated its breach of contract claims).

Finally, BNL's summary allegations gross negligence or willful misconduct do not create a genuine issue of material fact. As explained above, this Court has found that HVB acted consistent with its Duty of Care and obligation to act in Good Faith. This Court declines to find gross negligence and willful misconduct because HVB acted consistent with the explicit duties set forth in the Participation Agreement and there has been no proof offered in BNL's pleadings and responsive papers that would demonstrate gross negligence or willful misconduct.

### 7. BNL Urges this Court to Find Implied Contractual Terms

 In addition to the explicit duties set forth in the Participation Agreement, BNL argues that HVB owed certain other implied duties. Specifically, BNL seeks to imply good faith, reasonableness, a duty to investigate and fiduciary duty. Courts generally decline to rewrite agreements to provide the implied rights sought here by BNL which are not expressly set forth in an agreement. *See New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1021 (S.D.N.Y. 1991). Further, there is no "basis for reading fiduciary or other duties into agreements 'among sophisticated lending institutions.'" *Id.* Indeed, to the extent that BNL's claims against HVB is premised on purported implied duties, BNL has expressly waived such a claim. Paragraph 4(c), quoted above, specifically provides that HVB "shall have no obligation to [BNL] in respect of the Participating Interests, which is not expressly set forth in this Agreement." *Id.* Therefore, as is more fully set forth below, to the extent that these alleged duties are not expressly set forth in the Participation Agreement, this Court declines to hold HVB to implied duties.[15]

### i. Implied Duty of Good Faith and Fair Dealing

 BNL urges this Court to find that the Participation Agreement, as a contract made under New York law, must be read to include an implied standard of good faith and fair dealing. However, "courts do not impose an obligation which would be inconsistent with other terms of the

---

**15.** However, even if the implied duties did exist this Court would find: (i) that BNL failed to demonstrate that these implied duties were breached; (ii) no genuine issue as to any material fact that would warrant denial of judgment as a matter of law; and (iii) the standard of care imposed by any fiduciary relationship or objective standard of care that may have been created by the Participation Agreement was modified by agreement of HVB and BNL.

contractual relationship and for which the parties did not bargain." *Banco Espanol de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 45 (S.D.N.Y.1991). The court in *Banco Espanol de Credito* explained that:

> The implied covenant of good faith and fair dealing does not provide a court carte blanche to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with terms expressly set forth in the contract. . . . Nor can a court imply a covenant to supply additional terms for which the parties did not bargain.

*Banco Espanol,* 763 F.Supp. at 45 quoting *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 991 (S.D.N.Y.1989) (citations omitted).

■ The implied covenant of good faith does not "operate to create new contractual rights." *Banco Espanol,* 763 F.Supp. at 45 citing *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990). Rather, the implied covenant of good faith and fair dealing "applies to the performance and execution of an existing contract." *State St. Bank & Trust Co. v. Inversiones Errazuriz,* 246 F.Supp.2d 231, 241 (S.D.N.Y.2002).

BNL raises this argument with respect to, *inter alia,* the alleged fraudulent draw against the Letter of Credit; HVB's decision to pay on allegedly non-conforming draw documents; and the alleged failure of HVB to seek cash collateral and mitigate damages. (Defendant's 7056–1 Statement ¶ 11). However, BNL agreed to abide by HVB's determinations made pursuant to

the Duty of Care and obligation to act in Good Faith. These standards are deferential to HVB's practices. BNL's argument attempts to bring the Duty of Care and Good Faith into direct conflict with an implied duty, thereby imposing a new, inconsistent, standard by which to evaluate HVB's actions. Moreover, the signed Participation Agreement directly contradicts (particularly paragraph 4 of the Participation Agreement) any claim that HVB had an obligation to act pursuant to the covenant of good faith and fair dealing when taking actions with respect to the Letter of Credit.[16] (*See* Def.'s Mem. at 17).

■ This Court looks to the agreement between HVB and BNL to determine the scope of duties. These sophisticated parties drafted contract language that clearly defined their rights. The parties expressly excluded all other obligations. Where, as here, the parties carefully define their rights and obligations, and expressly exclude all other obligations, an implied, objective good faith obligation cannot be used to create additional or inconsistent terms. Therefore, this Court declines to find that the implied duty of good faith should be used to evaluate HVB's conduct with respect to its obligations under the Participation Agreement.[17]

Nonetheless, BNL cites to *Bank of China v. Chan,* 937 F.2d 780, 788–89 (2d Cir. 1991), for the proposition that a "bank can lose the benefit of its contract with a guarantor . . . by bad faith in handling letters of credit and failing to administer the un-

---

**16.** Furthermore, BNL has not made out any specific allegations of breach of this duty but has made mere summary allegations of breach.

**17.** BNL seeks authority for its position by, *inter alia,* analogizing the agreement of HVB and BNL to other situations: (i) a guarantor

bank; (ii) reasonable banking standards; (iii) breach of an agreement through misconduct; and (iv) U.C.C. Article 5.

The Participation Agreement is not a letter of credit and letter of credit law does not apply to interpret the Participation Agreement.

derlying loan properly and fairly". *See* Def.'s Mem. at 18. However, the unique circumstances that existed in *Bank of China* do not exist in this case.[18]

Assuming *arguendo* that an implied duty of good faith exists, this Court would still find for HVB. The Second Circuit in *Bank of China v. Chan*, 937 F.2d 780, 788–89 (2d Cir.1991) explained that the Uniform Commercial Code

> contains an implied covenant of good faith in the performance or enforcement of all contracts, with "good faith" defined as "honesty in fact in the conduct or transaction concerned." §§ 1–201(19), 1–203. The Second Restatement of Contracts provides that good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party".

Further, the Second Circuit cited the Restatement (2d) of Contracts, § 205 comment a, d, for the definition of bad faith

> may be overt or may consist of inaction ... the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure

to cooperate in the other party's performance.

*Bank of China*, 937 F.2d at 788–89

The court also explained that:

> a parties' actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties. The action presumed contrary to the parties' intention must directly violate an obligation that falls within their reasonable expectations, that is to say, the implied promise must be so much a part of a contract as to be essential to effectuate the contract's purposes.

*Bank of China*, 937 F.2d at 788–89.

 Moreover, a plaintiff claiming a breach must show "1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence." *Smith Barney, Harris Upham & Co. Inc. v. Liechtensteinische Landesbank*, 1993 U.S. Dist. LEXIS 3918, 1993 WL 97286 at *5 (S.D.N.Y.1993). This implied covenant "does not require a party to act against his own self interest even though the other party's interest may be incidentally adversely affected by the party's action." *State St. Bank & Trust Co. v. Inversiones*

---

**18.** As the court in *Daiwa Special Asset Corp. v. Desnick*, Civ. 00–3856, 2002 WL 1997922, at *10, 2002 U.S. Dist. LEXIS 16164, at *32 (S.D.N.Y. Aug. 29, 2002) explained, so too does this Court conclude:

> The egregious facts surrounding the transactions in Bank of China are not present here. In Bank of China, the bank issued "back to back" letters of credit thus putting it on both sides of the transaction. The bank issued 3 types of letters of credit: in favor of the corporation for the contract price (master letters of credit); in favor of the Chinese customers in the event the corporation breached its contract; and in favor of the corporation's American suppliers.

> The bank dishonored letters of credit in favor of the corporation even after proper documentation was submitted and failed to draw down the master letters of credit while permitting the Chinese customers to receive shipment of the goods. These actions, it was alleged, caused the corporation's financial ruin preventing it from paying its debt to the bank. The guarantor alleged, and the U.S. Second Circuit Court of Appeals agreed, that if the bank's actions caused the ultimate demise of the corporation it would be inequitable for it to recover. Those inequities are not present in the action before this Court.

*Errazuriz Limitada,* 246 F.Supp.2d 231, 241 *citing M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (*per curiam*); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972). It is well established that "the covenant [of good faith and fair dealing] is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement." *Downtown Athletic Club of New York City, Inc. v. Caspi Dev. Corp.,* No. 98/8194A, 1998 WL 898226, *9, 1998 Bankr.LEXIS 1642, *29 (S.D.N.Y. Dec. 21, 1998) (internal quotations and citations omitted).

In this case both HVB and BNL contemplated that HVB would honor proper draw documents, when presented HVB would promptly pay an honor, HVB would handle collection documents with the requisite care and that HVB would take no action that would deliberately prejudice BNL's rights, and thus its ability to recover funds paid under the Letter of Credit. This implied promise effectuated the purposes of the Participation Agreement. BNL has neither demonstrated that HVB failed to perform these obligations nor that there exists a genuine issue of material fact as to HVB's good faith.

### ii. Reasonableness

BNL argues that HVB failed to act as a "prudent banker," "reasonable banker" or "prudent issuer." These duties are not expressly included in the Participation Agreement which disclaims duties not expressly set forth. The Participation Agreement is an unambiguous contract and HVB's conduct must be held to the standards articulated in the Participation Agreement. The objective standards of reasonableness advanced by BNL are

therefore rejected. Moreover, the breach of any of these objective standards would, at most, result in a finding of ordinary negligence for which HVB may not be liable under the Participation Agreement. Therefore, this Court finds that BNL has failed to demonstrate that HVB should be held to an objective standard.

### iii. Duty to Investigate

BNL argues that before and after paying on Green Country's draw, HVB failed to investigate the circumstances of the draw. (Answer ¶¶ 33–34; Defendant's 7056-1 Statement ¶ 9). BNL urges this Court to find that by not investigating HVB breached its obligations under the Participation Agreement. (Answer ¶¶ 33–34).

A duty to investigate does not exist in the Participation Agreement which states that HVB "shall have no obligation to [BNL] in respect of the Participating Interests, which is not expressly set forth in this Agreement." The Participation Agreement at paragraph 4 explicitly protects HVB from liability arising out of presentation documents that are facially non-conforming, specifically, HVB "shall not be responsible for the due execution, legality, validity, enforceability, genuineness or sufficiency of the [Master Letter of Credit], the [Letter of Credit] or any document relative thereto or any collateral therefor or for the collectability of sums due thereunder."

Further, BNL failed to demonstrate that HVB should be held to a duty to investigate. Moreover, BNL has not demonstrated any facts that create a genuine issue of material fact regarding the duty to investigate.

### iv. Fiduciary Duty

BNL asserts that HVB owed a duty of loyalty to BNL that was breached in, *inter alia,* three ways: (i) when HVB did not

demand cash collateral from Enron Corp., assert a subrogation claim against NEPCO, or assert a claim on any funds due NEPCO from Green Country and Cogentrix; (ii) when HVB did not investigate whether the draw was fraudulent; and (iii) because HVB had an alleged conflict of interest. (Defendant's 7056–1 Statement ¶ 11). The fiduciary duty of loyalty that BNL asserts is articulated by BNL in two ways: (i) as a duty of loyalty arising out of an agency relationship between HVB and BNL; and (ii) as a duty of loyalty not expressly disclaimed by the Participation Agreement. (Answer ¶ 19, 27; Defendant's 7056–1 Statement ¶ 11; Def.'s Mem. at 16).

The Participation Agreement states that "[HVB] will sell and transfer to [BNL] without recourse, and [BNL] will buy, assume and receive for its own risk, an undivided 100 percent interest ('Participating Percentage') in the [letter of credit] and any draw thereunder (a 'Loan' and collectively with the [letter of credit], 'Participation Interest')." (Cogan Decl. Exh. 2F at ¶ 2). HVB therefore sold an interest in the Letter of Credit to BNL but retained an interest to administer the Letter of Credit.

The Participation Agreement expressly disclaims the existence of any obligation not set forth in the Participation Agreement. Specifically, the Participation Agreement states that HVB "shall have no obligation to [BNL] . . . which is not expressly set forth in [the Participation Agreement]." (Cogan Decl. Exh. 2F at ¶ 4(c)). As the Court concluded in *In re Continental Resources Corp.*, "[w]hatever fiduciary relationship may have been created by the participation agreement, if any, it was certainly qualified by the agreement's specific terms." *In re Continental Resources Corp.*, 799 F.2d 622, 625 (10th Cir.1986).

Under New York law, " '[a] fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Official Comm. of Unsecured Creditors of SMTK Expedite, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, Civ. 00–8688, 2002 WL 362794, at *8, 2002 U.S. Dist. LEXIS 3747, at *47 (S.D.N.Y. Mar. 6, 2002) *citing Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (*quoting* Restatement (Second) of Torts § 874 cmt. a). A fiduciary relationship has been defined as:

a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

*Official Comm. of Unsecured Creditors of SMTK Expedite, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, Civ. 00 8688, 2002 WL 362794, at *8, 2002 U.S. Dist. LEXIS 3747, at *47 (S.D.N.Y. Mar. 6, 2002) *citing Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976).

Based on those standards, this Court concludes that BNL has not set forth sufficient allegations to suggest the existence of a fiduciary relationship between HVB and BNL. *Greenberg v. Chrust*, 198 F.Supp.2d 578, 583 (S.D.N.Y.2002) (finding that when parties to a commercial transaction deal at arm's length, without more there is no basis to impute a fiduciary obligation) *citing Beneficial Commercial Corp. v. Murray Glick Datsun Inc.*, 601

F.Supp. 770, 772 (S.D.N.Y.1985) ("[n]o fiduciary relationship exists under the facts alleged in the pleadings which show that the two parties were acting and contracting at arm's length"); *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 426 (S.D.N.Y.1992) ("where parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances").

■ Further, "conclusory statements about the existence of a fiduciary relationship" are insufficient to establish such a relationship. *Greenberg v. Chrust*, 198 F.Supp.2d at 583 *citing Compania Sud–Americana*, 785 F.Supp. at 425–26 (finding no fiduciary relationship when plaintiff failed to establish "that the dealings between the parties were not arm's length"); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 434 (S.D.N.Y.1998) (holding that a conventional business relationship does not become a fiduciary relationship merely by allegation). BNL has not demonstrated any fiduciary relationship beyond mere assertions that one existed.

The Second Circuit in *Banque Arabe* stated that with respect to loan participation agreements "there is deemed to be no fiduciary relationship unless expressly and unequivocally created by contract." [19] *Banque Arabe*, 57 F.3d at 158; *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*,

No. 96–3231, 2001 WL 396521, at *9, 2001 U.S. Dist. LEXIS 4818, at *28 (S.D.N.Y. Apr. 19, 2001). The allegations of fiduciary duty are conclusory and the facts alleged are insufficient to show that a fiduciary duty existed between HVB and BNL or that there is a material issue of fact to be decided. Here, HVB and BNL engaged in arm's length negotiations, and the Participation Agreement at paragraph 5 explicitly disclaims any reliance by BNL on HVB for information regarding its credit analysis and funding decision. This Court finds that based upon the record before the Court BNL has not made out any allegations that raise an issue of fact regarding the existence or a breach of such a fiduciary relationship. The mere allegation of a fiduciary relationship is insufficient to create a genuine issue of material fact. Since no fiduciary relationship has been established, BNL's claim that HVB's alleged conflict of interest breached a duty can raise no issues of fact. Further, the Participation Agreement at paragraph 4(c) disclaimed obligations not expressly set forth therein.

■ As was the case between HVB and BNL, in "arm's length transactions between large financial institutions, no fiduciary relationship exists unless one was created in the agreement." *Banco Espanol de Credito v. Security Pacific Nat'l Bank*, 763 F.Supp. 36, 45 (S.D.N.Y. 1991). Additionally, as the court in *In*

---

**19.** The Second Circuit in *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 158 (2d Cir.1995) held that "[g]enerally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care." However, the Second Circuit in *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 103 (2d Cir.2001) analyzed the New York Court of Appeals decision, *Kimmell v. Schaefer*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996), dealing with the " 'special relationship' component of a negligent misrepresentation claim." The Second Circuit in *Suez* concluded that its decision in *Banque Arabe* was decided before *Kimmell* and it is therefore of limited precedential value on the state law issue of whether a special relationship exists in banking relationships as it relates to claims for negligent misrepresentation. BNL has not argued that it was in a "special relationship" with HVB or negligent misrepresentation by HVB.

re Colocotronis Tanker Sec. Lit., said "[participation] agreements are arm's length contracts between relatively sophisticated financial institutions and do not establish fiduciary relationships such as exist between the management of a corporation and the corporation's shareholders or even its debenture holders." In re Colocotronis Tanker Sec. Lit., 449 F.Supp. 828, 833 (S.D.N.Y.1978).

BNL fails to establish that the Participation Agreement established a fiduciary relationship that would give rise to a duty of loyalty. Therefore, this Court determines that HVB did not owe a duty of loyalty to BNL beyond that which was expressly set forth in the Participation Agreement.

BNL also argues that the Participation Agreement created an agency relationship between HVB and BNL. BNL raises this argument but fails to argue it beyond mere assertion. Although the Participation Agreement may have created some agency relationship between HVB and BNL, the relationship was limited to the servicing of the loan. However, the "fact that a participation agreement creates an agency does not necessarily mean that a lead bank owes a fiduciary duty to the participant bank." First Nat'l Bank v. Mercantile Bank, No. 88–1370, 1989 WL 159349, at 8, 1989 U.S. Dist. LEXIS 15768, at *24 (D.Kan. Dec. 28, 1989). BNL has neither adequately demonstrated that the alleged agency relationship was breached nor that it encompassed fiduciary duties.

The Participation Agreement set forth the standard of care attributable to HVB and expressly allocated the duties and obligations of HVB and BNL. Fiduciary duties do not appear in the Participation Agreement, and this Court declines to imply such duties. The Court holds that BNL has failed to present a genuine issue of material fact going to whether the rela-tionship between HVB and BNL was fiduciary in nature or that there was a breach of the alleged fiduciary relationship.

Moreover, BNL has failed to demonstrate a duty of loyalty not expressly disclaimed or a duty of loyalty arising out of an agency relationship. The record instead reflects that two relatively large and sophisticated banks contracted for a loan participation involving a substantial amount of money and that the transaction was at arm's length and did not create a fiduciary relationship.

### 8. Conflict of Interest

■ BNL asserts that HVB had a conflict of interest that should relieve BNL from having to reimburse HVB for the draw ("Conflict of Interest").

#### i. The Participation Agreement Was an Arm's Length Transaction

BNL's Conflict of Interest theory is premised, in part, upon an assertion that HVB was motivated to pay the Letter of Credit in violation of letter of credit law in order to insure the continued profitability of its other loan arrangements with Green Country/Cogentrix. BNL's allegations of Conflict of Interest are unsupported by the facts presented. Documents from HVB's files that are attached to the Second Supplemental Affidavit of Michael C. Lambert are dated after the Letter of Credit draw and do not indicate or in any way lead to the conclusion that HVB decided to pay the draw based upon its other loan obligations.

Additionally, Wynn, the HVB employee responsible for approving the drawdown, was not aware of HVB's other lending relationships with Green Country/Cogentrix. Therefore, no proof has been adduced that Wynn's judgment was affected by HVB's Green Country/Cogentrix loan portfolio. Also, DePaula had no communi-

cations with the HVB personnel responsible for the drawdown and therefore did not convey any information concerning HVB's project finance involvement with Green Country. Further, Esposito had no knowledge concerning HVB's other loan arrangements with Green Country/Cogentrix.

Nonetheless, BNL attempts to draw an inference from the circumstances of HVB's position as an issuer and lender, that HVB caused a drawdown on the Letter of Credit at the expense of BNL for HVB's ultimate benefit as a lender to the Green Country/Cogentrix.

An examination of the loans identified by BNL demonstrates that the loans to Green Country/Cogentrix were made prior to HVB and BNL entering into the Participation Agreement. Cogentrix had five loans/projects on which HVB was a lender: (i) Cogentrix Eastern America Inc. $20,000,000; (ii) Cogentrix Energy Inc. (corporate exposure) $18,000,000; (iii) Cogentrix of Richmond Inc. $19,400,000; (iv) Green Country Energy LLC $20,500,000; and (v) Ouachita Power LLC $25,500,000. (Supplemental Lambert Aff. Exh. C).

The loan to Green Country Energy LLC for $20,500,000 by HVB's Project Finance Division was made by HVB as part of a Bank of America-led project finance syndicate formed to finance construction of the Jenks Plant. (Supplemental Lambert Aff. ¶ 10; Exh. C). HVB made project finance loans to Green Country via the syndicate in the form of two (2) notes issued on March 31, 2000, that totaled $20,075,679.17.[20] (Supplemental Lambert Aff. Exh. B, C). The project finance notes

were issued approximately eight months before Enron applied for the Letter of Credit, and approximately eleven months before HVB and BNL entered into the Participation Agreement.

The loans to Cogentrix Eastern America Inc. ($20,000,000); Cogentrix of Richmond Inc. ($19,400,000); and Ouachita Power LLC ($25,500,000), BNL has not demonstrated that the timing of these loans are relevant or that they occurred before or after the signing of the Participation Agreement. However, a review of the documents, as well as the Cogentrix Form 10–K for fiscal year ending December 1999 and December 2000, suggests that the loans for these projects were made before the Participation Agreement was signed.[21]

The loan to Cogentrix Energy Inc. for $18,000,000 appears to have been "corporate exposure" in the form of a loan made by HVB's Corporate Finance Department to Cogentrix for the Jenks Plant. (Supplemental Lambert Aff. Exh. C). BNL points to the Cogentrix Form 10–K for fiscal year ending December 31, 2001, which states that Cogentrix had a $250,000,000 "Corporate Credit Facility" with a syndicate of banks expiring in October 2003. (Second Supp. Lambert Aff. Exh. D). BNL argues that HVB's loan of $18,000,000 was part of the syndicate that funded the Corporate Credit Facility. However, the Cogentrix Form 10–K for fiscal year ending December 31, 2000 contains a nearly identical statement concerning the Corporate Credit Facility. Therefore, it appears to the Court that the $18,000,000 loan to Cogentrix was made prior to HVB and BNL entering into the

---

**20.** There is a discrepancy between the amount listed on Exhibit C and the notes at Exhibit B. It is the Court's understanding that despite this discrepancy the references are to the same loan.

**21.** The Cogentrix Forms 10–K for fiscal year ending December 31, 1999 and December 31, 2000 were not submitted by the parties but the Court obtained copies from the Internet website of the Securities and Exchange Commission and takes judicial notice thereof.

Participation Agreement and BNL has not alleged anything to the contrary.

It was BNL and Enron that approached HVB to enter into the Participation Agreement. It has not been demonstrated that any of the loan arrangements were entered into between HVB and Green Country/Cogentrix after the Participation Agreement was signed. Thus, BNL took HVB as it was.

BNL has never asserted that access to information about HVB's lending relationships with Green Country/Cogentrix was not available by due diligence on the part of BNL. Causation between the non-disclosure and injury would still be required and that is thoroughly negated by paragraph 5 of the Participation Agreement which states that BNL would "independently and without reliance upon [HVB] and based on the financial statements and such other documents and information as [BNL] has deemed appropriate, made its own credit analysis and decision to enter into [the Participation Agreement]." This provision indicates BNL understood that it required information to understand the risks associated with entering into the Participation Agreement.

In the case of arm's length transactions between large financial institutions, no fiduciary relationship exists unless one was created in the agreement and no independently imposed duty of volunteering disclosure exists. *Banco Espanol de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 45 (S.D.N.Y.1991). The Participation Agreement does not include an obligation of HVB to disclose information that BNL might think is relevant. BNL has not asserted that it was denied access to information about HVB's other loan arrangements. BNL has not indicated that it would not have entered into the Participation Agreement if it had known of the so-called conflict. BNL does not make

any allegation that it was fraudulently induced to enter into the Participation Agreement. BNL does not assert that it requested information from HVB concerning potential conflicts and that it was misled. Further, there is no indication from the record that HVB had a fiduciary duty to disclose its dealings with non-Enron entities or that HVB had a duty to speak.

Also missing from BNL's version of the events are any facts that demonstrate that HVB had a tangible pecuniary interest in seeing that the Letter of Credit was paid. BNL leaves the Court to assume that the funds would eventually flow from Green Country to HVB either directly or indirectly through Cogentrix.

The two banks negotiated for the Duty of Care and obligation to act in Good Faith. A conclusion that the mere existence of a lender relationship between HVB and Green Country/Cogentrix resulted in a conflict that prejudiced BNL's rights under the Participation Agreement is not warranted beyond what BNL accepted when it entered into the arrangement.

This Court concludes that no evidence has been adduced that would demonstrate that payment of the Letter of Credit resulted in a breach of the Duty of Care or obligation to act in Good Faith. BNL's contention that HVB's Conflict of Interest resulted in a breach of the Participation Agreement is devoid of any material factual or legal issues.

### ii. The Conflict of Interest as a Breach of the Participation Agreement

BNL argues that "HVB had a conflict of interest undisclosed to BNL by reason of its loans to Cogentrix-related entities, including Green Country." (Defendant's 7056-1 Statement ¶ 3). The Court recognizes that a threshold consideration is the

relationship in time between the Participation Agreement and the loans that HVB entered into with Green Country/Cogentrix. As the Court concluded above, the loans between HVB and Green Country/Cogentrix were entered into before the Participation Agreement was signed. BNL effectively waived the existence of these lending relationships as a conflict of interest. Also, BNL has not established that BNL's alleged lack of knowledge regarding the alleged conflict of interest resulted from a failure of a duty to disclose by HVB or that HVB in any way inhibited BNL's ability to ascertain such information that concerned BNL's due diligence prior to entry into the Participation Agreement. Thus, BNL has failed to demonstrate that the Conflict of Interest *a fortiori* constituted a breach of the Participation Agreement.

### iii. The Conflict of Interest Caused HVB to Act and Breach the Participation Agreement

BNL argues that "HVB's actions in so honoring Green Country's presentation in light of its undisclosed involvement in loans on the Jenks [Plant] and other Cogentrix-related projects caused HVB to breach its duties and obligations to BNL under the Participation Agreement." (Defendant's 7056–1 Statement ¶ 5). Specifically, BNL argues that HVB's actions in light of the Conflict of Interest caused HVB to breach its Duty of Care; its obligation to act in Good Faith; and its duty of loyalty to BNL. (Answer ¶¶ 27–32; 35–37; Defendant's 7056–1 Statement ¶ 5; Def.'s Mem. at 16; Supplemental Lambert Aff. ¶ 25).

In order to find that HVB breached the Duty of Care this Court would need to conclude that HVB acted inconsistent with its usual standard of conduct. However, nothing has been demonstrated that it was inconsistent with HVB's usual procedures

to be both lender and issuer on a project and to have paid a draw under such circumstances. The essence of BNL's argument is that had HVB not sold a participating interest in the Letter of Credit, HVB would not have honored the draw. However, BNL has not demonstrated that HVB would have dishonored the Letter of Credit had it been the sole owner of the Letter of Credit. Further, for HVB to have breached its obligation to act in Good Faith, this Court would need to find that HVB's conduct was designed to harm BNL. This Court has found that BNL has not demonstrated that it was owed fiduciary duties. Thus, HVB is not liable for a breach of a duty of loyalty. Nothing has been shown that demonstrates that HVB intended to harm or that the alleged knowledge possessed at the corporate level was directed to injure BNL.

### iv. BNL Alleges that HVB Caused BNL to Make an Unsecured Loan

BNL argues that "HVB honored Green Country's presentation in order to cause BNL to make an involuntary, unsecured $39 million loan the proceeds of which would be available to support HVB's own approximately $20 million secured loan to fund the construction of the project for which the [Letter of Credit] was issued and drawn ... and/or HVB's own loans to other Cogentrix-related projects." (Defendant's 7056–1 Statement ¶ 4). BNL has not set forth any facts that support such an allegation other than a conclusory statement to such effect.

### v. BNL Alleges that HVB to Failed to Mitigate Damages Because of the Conflict of Interest

Moreover, BNL argues that the conflict of interest caused HVB to fail to mitigate damages. (See Answer ¶ 36; Third Supp. Lambert Aff. ¶¶ 17–22).

BNL has also alleged that HVB, in violation of its duties and because of the alleged Conflict of Interest, refused to do anything to attempt to recover the overdraw paid pursuant to the Letter of Credit thus failing to mitigate damages, or protect BNL's rights. (Second Supp. Lambert Aff. ¶ 7; Third Supp. Lambert Aff. ¶ 3). Specifically, BNL argues that: "HVB breached its duty under the Participation Agreement because HVB had conflicts of interest." (Third Supp. Lambert Aff. ¶ 17). BNL states that its conflicts argument is not limited "solely to the act of paying the Letter of Credit." *Id.* Rather, "HVB's continuing failure to do anything to recover the overdraw as a result of the conflict of interest, and ... demonstrates HVB's continued pattern of bad faith to assure that Cogentrix not only received but continued to enjoy the use of the $39 million because that was in HVB's own self-interest." *Id.*

Specifically, BNL charges HVB breached the Duty of Care, obligation to act in Good Faith, the duty of loyalty and duty not to act with gross negligence and willful misconduct when HVB did not: (a) assert a subrogation claim against NEPCO/NEPCO Procurement; (b) attach or otherwise assert a claim on any funds due NEPCO from Green Country and Cogentrix; and (c) or otherwise attempt to get the $39,000,000 back from Cogentrix or Green Country ("Mitigation of Damages" or "Mitigate Damages"). (See Answer ¶ 36; Defendant's 7056–1 Statement ¶ 11; Supplemental Lambert Aff. ¶ 25; Third Supp. Lambert Aff. ¶¶ 17–22). BNL's argument that HVB has not taken any steps to recover the alleged overdraw is unpersuasive and does not demonstrate a material issue of fact or law for several reasons.

First, BNL asserts that HVB should have sought to Mitigate Damages by commencing legal process against NEPCO,

and Green Country/Cogentrix. The Letter of Credit was issued pursuant to the terms of the Master Letter of Credit entered into between HVB and Enron which allowed for HVB to reimbursement for the Letter of Credit draw from Enron. However, Enron's entry into bankruptcy on December 2, 2001, and Green Country's draw resulted in HVB becoming an unsecured creditor of Enron in the amount of the draw.

HVB looked to its Participation Agreement for reimbursement. Under paragraph 3 of the Participation Agreement, BNL became obligated to "promptly" reimburse HVB for the Letter of Credit draw. BNL's argument is a bad faith attempt to recast its obligation to reimburse HVB as contingent upon HVB commencing legal action against NEPCO or Green Country/Cogentrix. The Participation Agreement does not establish that HVB had such duties and none will be implied.

 Based upon the language of the Participation Agreement, this Court reaches two further conclusions concerning the Mitigation of Damages issue raised by BNL. First, this Court rejects the argument that HVB had a duty to recover the alleged overdraw. *See Colorado State Bank of Walsh v. Federal Deposit Ins. Corp.*, 671 F.Supp. 706, 707 (D.Co.1987). Second, this Court finds that BNL assumed the risk of Enron's inability to repay loans. *See People's Bank v. Bankers Trust Co.*, No. 592100, 1992 WL 365363, at *2, 1992 U.S. Dist. LEXIS 18460, at *6 (D.Conn. Nov. 6, 1992). These conclusions are supported by the terms of the unambiguous Participation Agreement.

The Participation Agreement at paragraph 4 establishes that

(ii) [HVB] shall not be responsible for any statement, warranty or representation made in or in connection with the

[Master Letter of Credit] or any document relative thereto or in any way for the financial condition of [Enron Corp.] or any guarantor or for the value of any collateral . . . [and HVB] (v) shall not be responsible for the due execution, legality, validity, enforceability, genuineness or sufficiency of the [Master Letter of Credit], the [Letter of Credit] or any document relative thereto or any collateral therefor or for the collectability of sums due thereunder . . .

The Participation Agreement at paragraph 5 further establishes that

(a) [BNL] represents that . . . (i) it has, independently and without reliance upon [HVB] and based on the financial statements and such other documents and information as [BNL] has deemed appropriate, made its own credit analysis and decision to enter into [the Participation Agreement].

. . . .

(b) [BNL] will, independently and without reliance upon [HVB] and based on such documents and information as [BNL] shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under [the Participation Agreement].

The Participation Agreement expressly excluded HVB from any liability for the collectability of any sums due under the Master Letter of Credit and the Letter of Credit. HVB did not promise to collect or enforce the Master Letter of Credit or the Letter of Credit. Rather, the terms of the Participation Agreement leave to HVB full discretion as to whether or when to collect or enforce the Letter of Credit. The express terms of the Participation Agreement do not mention a duty on the part of HVB to collect or enforce the Letter of Credit to protect the interests of BNL.

BNL's Mitigation of Damages argument is an attempt to overlay an implied duty onto the Participation Agreement. The court in *Colorado State Bank*, confronted with a similar argument, stated that the participation agreement as drafted did not provide for an obligation to collect and enforce because the parties used the wrong form agreement. Specifically, the court stated that:

[there was an] apparent misuse of a form agreement obviously designed for participation by the assignment of an undivided partial interest in the loan. If the assignor bank retained some interest, it would have a common objective in collecting for the benefit of both banks. It would be expected that when a full 100% interest is assigned, the loan would be transferred to the assignee to collect for its own account.

*Colorado State Bank*, 671 F.Supp. at 707.

BNL seeks to re-write the Participation Agreement in order to place collection obligations on HVB. In light of the Participation Agreement, HVB did not have such a duty.

The Participation Agreement at paragraph 4 establishes that HVB has no responsibility for the financial condition of Enron or collectability of the Letter of Credit. Paragraph 5 establishes that BNL made its own financial analysis to enter into the Participation Agreement. Therefore, BNL expressly assumed the risk of Enron's inability to repay loans. *People's Bank v. Bankers Trust Co.*, No. 5–92–100, 1992 WL 365363, at *2, 1992 U.S. Dist. LEXIS 18460, at *6 (D.Conn. Nov. 6, 1992). BNL has not shown any proof that would tend to demonstrate that HVB had a duty to Mitigate Damages or that HVB breached such a duty.

### vi. Summary

In summary, BNL has failed to demonstrate any facts that would suggest HVB honored Green Country's presentation in

order to cause BNL to advance $39,000,000 for the purpose of (i) supporting HVB's own secured loans used to fund the construction of the Jenks Plant for which the Letter of Credit was issued and drawn and/or (ii) HVB's own loans to other Cogentrix-related projects. (Defendant's 7056–1 Statement ¶ 4).

Based upon the facts presented by BNL, arguably a "conflict" exists, but this Court must consider whether there were in fact breaches of the Participation Agreement. BNL has failed to demonstrate that the conflict, in and of itself, constituted a breach of the Participation Agreement.

BNL has not demonstrated a genuine issue of material fact or law that shows the alleged Conflict of Interest was (i) a breach, (ii) caused HVB to breach the Participation Agreement, or (iii) fail to mitigate damages.

### 9. BNL's "Chargeable With Knowledge" Argument

BNL argues throughout[22] that HVB "is chargeable with knowledge." BNL argues that regardless of what Esposito and Wynn knew or did not know about the bank's loan exposures to Cogentrix, HVB is chargeable with knowledge of those exposures whether they were compartmentalized in HVB's Corporate Finance Division or its Project Finance Division. (Third Supp. Lambert Aff. ¶ 22).

At the center of BNL's argument is that HVB should not have paid the Letter of Credit draw because of two key facts: (i) Enron was in bankruptcy, and (ii) Green Country drew down on the entire Letter of Credit amount. BNL then seeks to overlay these facts with the Conflict of Interest in order to demonstrate that regardless of

any individual's knowledge in the conduct of honoring the drawdown, the interests of HVB as an entity was in conflict with the interests of BNL. This theory is problematic for BNL for several reasons. First, the Duty of Care and obligation to act in Good Faith are subjective duties of care. Second, BNL has not demonstrated that it was inconsistent with HVB's Duty of Care to honor a letter of credit under the circumstances. Third, no facts have been shown by BNL that demonstrate that HVB, as an entity, with all the knowledge of all components of HVB, violated the terms of the Participation Agreement. Fourth, to the extent there is a Conflict of Interest, it existed at the time the Participation Agreement was entered into with BNL and BNL does not allege that HVB in any way frustrated or misled BNL at the time the agreement was consummated. Therefore, the presence of a Conflict of Interest as alleged itself, would not be a breach of the Participation Agreement but could only be a rationale for why HVB may have otherwise breached the Participation Agreement.

Whether they are chargeable with knowledge is irrelevant because the issue is what would HVB do if it were the ultimate obligor on the Letter of Credit. Imputed knowledge or knowledge at a diffuse corporate level may be relevant to negligence but since ordinary negligence is excluded it would only be relevant for gross negligence or willful misconduct. However, BNL has not demonstrated a genuine issue of material fact or satisfied the Second Circuit's standard for additional discovery (see *infra.*).

### 10. Additional Discovery

BNL objected to summary judgment on

---

**22.** BNL makes this argument in connection with, *inter alia:* (i) investigating the circumstances of the draw; (ii) paying a draw on allegedly fraudulent draw documents; (iii) conspiring in a scheme to overdraw.

Rule 56(f) grounds.[23] (Second Supp. Lambert Aff. ¶¶ 2–6). This Court's Discovery Order dated December 16, 2002 provided BNL an opportunity for additional discovery regarding the "actual knowledge" of certain HVB employees.

■ In seeking additional discovery BNL was required to explain the nature of the uncompleted discovery, i.e., what facts were sought and how they were to be obtained, how those facts were reasonably expected to create a genuine issue of material fact, what efforts it had made to obtain those facts, and why those efforts were unsuccessful. *Doe v. The New York Blood Center*, Civ. No. 01–9128–39, Fed.Appx. 686, 688, 2002 U.S.App. LEXIS 14447, at *5 (2d Cir. July 17, 2002).

■ The Second Supplemental of Michael Lambert dated October 29, 2002 explains that this Court should permit BNL to explore "matters further in discovery and through cross-examination. HVB should not be allowed to explain away undisclosed and essentially unchallenged corporate conflicts by three self-serving affidavits in which the affiants each claim he or she personally lacked knowledge of the conflicts." (Second Supp. Lambert Aff. ¶ 6).

After oral argument on the issue of additional discovery, BNL was permitted to depose Wynn and Esposito concerning their knowledge and whether their conduct conformed to the Duty of Care and obligation to act in Good Faith. However, BNL failed to establish in its request for additional discovery (consistent with the Second Circuit's decision in *Doe v. The New York Blood Center* and under Rule 56(f)) that additional discovery beyond what was granted would lead to evidence that could raise a genuine issue of material fact.

## IV. CONCLUSION

The parties contracted for a standard dependent upon HVB's own practice, not necessarily industry practice, what a reasonable banker would do, or what letter of credit law requires. The Participation Agreement establishes a standard of care for HVB to observe, with respect to BNL, that may be higher or lower than what is required by letter of credit law and exculpates HVB for negligent acts.

As HVB explains "BNL contracted to take the Enron risk on [the Letter of Credit]. That risk looked good when Enron was trading at $83 per share. BNL cannot avoid the risk now that it has materialized." (Pl.'s Mem. at 3).

HVB acted consistent with the Duty of Care and its obligation to act in Good Faith. BNL has not demonstrated any facts to the contrary.

For the above stated reasons, HVB's summary judgment is granted. HVB is directed to settle an order on five days' notice consistent with this decision.

■

---

**23.** In addition to having its request for additional discovery granted on December 16, 2002, BNL has had ample opportunity for discovery in this adversary proceeding and related bankruptcy proceeding. BNL was permitted to proceed with discovery in state court despite the pendency of the state court summary judgment motion. Also, BNL took discovery with respect to a sale motion involving SNC Lavalin Constructors.